920 A.2d 135 (2007)
392 N.J. Super. 157
PROSPECT REHABILITATION SERVICES, INC., Plaintiff-Appellant,
v.
Generoso SQUITIERI, Esq., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 2006.
Decided April 16, 2007.
Anthony Argiropoulos, Lawrenceville, argued the cause for appellant (Fox Rothschild, attorneys; R. James Kravitz and Mr. Argiropoulos, of counsel and on the brief).
Christopher J. Carey, Morristown, argued the cause for respondent (Graham Curtin, attorneys; Mr. Carey, of counsel and on the brief; Barry J. Muller, on the brief).
Before Judges COBURN, AXELRAD and R.B. COLEMAN.
*136 The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
Plaintiff Prospect Rehabilitative Services, Inc. appeals from summary judgment dismissal of its legal malpractice complaint against its former attorney, defendant Generoso Squitieri. The complaint was dismissed on the ground that plaintiff had voluntarily settled the underlying case without exhausting its appeal and separate active lawsuits, and thus was precluded as a matter of law from attempting to recoup the difference in the malpractice action against defendant. We reverse and remand.
In April 2001, Squitieri filed suit on plaintiff's behalf against two nursing homes, designated as "Woodcliffe Lake Manor Care, Inc." and "Dellridge Nursing Home, Inc.," and their principal Nathan Friedman. In the eleven-count complaint, plaintiff sought to recover alleged overpayments of rent and construction advances totaling about $70,000, and also asserted Consumer Fraud Act and RICO claims. The nursing homes filed a counterclaim alleging $45,000 in unpaid rent.
Following adverse non-binding arbitration on March 18, 2002, during which the arbitrator awarded the nursing homes $45,000 on their counterclaim, Squitieri filed a demand for a trial de novo on plaintiff's behalf. Squitieri certified that as a result of a comment made by plaintiff's principal Joseph Thomas during the arbitration, he first learned of potential Medicare denial claims against the nursing homes totaling about $400,000, based on their physicians' alleged failure to submit timely documentation to Medicare that the patients required physical and occupational therapy, in violation of the parties' Provider Service Agreement.[1] Thomas alleged that he discussed the potential Medicare claims against the nursing homes during his early consultations with Squitieri.
On April 5, 2002, Thomas terminated Squitieri's services and retained his present counsel, James Kravitz. Kravitz filed a substitution of attorney on April 24, and a Motion for Leave to File an Amendment to the Complaint and Answer to the Counterclaim on April 25. Unbeknownst to Kravitz, a July 1, 2002, trial date had been scheduled prior to the filing of his substitution of attorney. The moving papers are not a part of the appellate record, but at oral argument on the motion on June 7, 2002, Kravitz stated he sought to amend the complaint to add the $400,000 Medicare denial claim and for additional discovery but "if need be, [plaintiff] would rest simply on just obtaining the amendment to the pleadings and go into the trial without any discovery." Kravitz argued the issue required "virtually no discovery" as the claims were based on breach of the parties' contracts obligating the nursing homes to provide physician authorizations for patient treatment, which were not done, resulting in denial of Medicare reimbursement. Kravitz further represented that administrative regulations required a physician's signed, dated authorization for physical therapy every thirty days to sustain reimbursement for healthcare facility patients. Plaintiff also sought to amend its answer to the nursing homes' counterclaim to assert an affirmative defense under the Medicaid Anti-Kickback statute *137 and statute of frauds.[2] Plaintiff's counsel stated he would be prepared to produce witnesses and answer interrogatories in five days, and would provide any requested discovery on as short notice as possible. Alternatively, plaintiff sought leave, under the entire controversy rule, to bring its claims in a separate action. Plaintiff relied on the liberal standard of amendment to the pleadings, R. 4:9-1, and the fact that the rule had not been amended after the best practice rule amendments, and argued that the complaint was only a year old and there was no indication that documents or witnesses were unavailable.
The trial court denied the motion for leave to amend the complaint. It found discovery would need to be extended and that plaintiff had failed to establish "exceptional circumstances" under R. 4:24-1(c) for extension of the discovery period after the trial date had been set, noting that lack of attorney diligence was insufficient under the case law. The court was satisfied, however, that a different analysis was required as to plaintiff's affirmative defense to the counterclaim, particularly as it involved an assertion of a criminal violation. Plaintiff was granted leave to amend its answer to the counterclaim, discovery was extended for about ninety days to address the affirmative defense, and the July 1 trial date was adjourned.
On November 8, 2002, an order granting partial summary judgment to the nursing homes was entered, which dismissed the complaint against Friedman and plaintiff's RICO claims, as well as plaintiff's newly-asserted defenses to the counterclaim alleging statute of frauds and violation of the Medicaid Anti-Kickback Act. Following a five-day jury trial, plaintiff obtained a jury verdict in its favor for about $74,500 on its claims for overpayment of rent and construction advances, and judgment was entered on December 17, 2002, also conforming defendants' names to Woodcliff Lake Manor, L.L.C., and Dellridge Care Center, L.P. In January 2003, plaintiff appealed the denial of its motion to amend its complaint to seek the additional $400,000 in Medicare denial claims, and the nursing homes cross-appealed the jury verdict.
In October 2002 and May 2003, plaintiff filed separate lawsuits against Dellridge General Corp., the general partner of Dellridge Nursing Home, L.P., and Woodcliff Lake Manor, L.L.C., seeking damages for breach of contract and fraud claims relating to the Medicare denials. In May 2003, Dellridge filed a motion for summary judgment to dismiss plaintiff's complaint as barred by the entire controversy doctrine, collateral estoppel, res judicata, judicial estoppel, and the Uniform Partnership Act, with Woodcliff's counsel indicating it intended to file a similar motion.
In June 2003, plaintiff settled all of its outstanding claims against the nursing home defendants for a total of $115,000, or $40,000 in excess of the judgment awarded to plaintiff at trial. Plaintiff dismissed the lawsuits against both nursing homes, as well as its pending appeal, and the nursing homes dismissed their cross-appeal. According to Kravitz's certification, plaintiff's decision to settle the matter was based on a number of factors. Plaintiff reasoned that its appeal represented an "uphill battle" seeking reversal of a discretionary decision of a well-respected presiding judge where plaintiff had no legitimate explanation for its failure to include the denied Medicare reimbursement claims in *138 the initial complaint other than attorney neglect. Moreover, though plaintiff believed it was unlikely the cross-appeal would be successful, there was a risk the jury verdict could be overturned as the nursing homes had prevailed at arbitration. Additionally, Kravitz certified he filed the subsequent lawsuits against the nursing homes solely to preserve the statute of limitations if plaintiff's appeal was successful, based on a concern that Squitieri had failed to properly designate the defendants in the initial action, and when the two defendants acknowledged that they were the same parties identified in the initial action, "there was no non-frivolous basis to proceed" with the October 2002 and May 2003 lawsuits. Plaintiff also considered the additional litigation expenses of defending the summary judgment motions and prosecuting the appeal.
Plaintiff then filed this malpractice action against Squitieri, alleging negligence in failing to assert the Medicare denial claims against the nursing homes, misnaming parties, and failing to propound any discovery. Plaintiff alleged that as a result of Squitieri's negligence, it lost the means to recover almost $400,000 in damages for denied Medicare claims and the means to obtain a potential award from the jury for punitive damages, and it was also required to expend significant attorneys' fees in rectifying Squitieri's errors. Plaintiff contended its "efforts to mitigate its damages have yielded only $40,000 on its claims," and thus, it sought damages for the difference.
Squitieri moved for summary judgment, asserting that the tactical decision of plaintiff, with the assistance of its new attorney, to settle the underlying case for less than it was worth rather than proceeding with its appeal and second lawsuits against the nursing homes barred its subsequent legal malpractice action. Squitieri relied primarily on Puder v. Buechel, 183 N.J. 428, 874 A.2d 534 (2005). In Puder, in response to a collection action for unpaid legal fees, the client, Kathleen Buechel, asserted a malpractice counterclaim alleging her attorney negotiated an inadequate divorce settlement and failed to obtain informed consent before accepting it. Id. at 430, 874 A.2d 534. While that action was pending, Buechel retained new matrimonial counsel. Id. at 432, 874 A.2d 534. During a plenary hearing on her husband's motion to enforce the settlement agreement, a second divorce settlement was negotiated, substantially similar to the first one, which Buechel stated on the record was "acceptable" and a "fair compromise of the issues" in her matrimonial case. Id. at 433-34, 874 A.2d 534. Our Supreme Court affirmed the summary judgment dismissal of the malpractice counterclaim based on the public policy favoring conclusive settlements and Buechel's representations concerning the acceptability and fairness of the second settlement, which clearly reflected her satisfaction with the resolution of the underlying action. Id. at 437, 874 A.2d 534. The Court distinguished Ziegelheim v. Apollo, 128 N.J. 250, 607 A.2d 1298 (1992), where a client was permitted to bring a legal malpractice action against her former attorney after the client agreed to a negotiated matrimonial settlement noting, among other items, that Buechel's malpractice claim was not her only remedy to the alleged malpractice. Puder, supra, 183 N.J. at 442, 874 A.2d 534. The Court found that Buechel made a "calculated decision" to accept a second settlement, negotiated by a new attorney, before the trial court could decide whether the first agreement was enforceable, which might have alleviated the need to sue the former attorney for negligence. Id. at 442-43, 874 A.2d 534.
*139 Plaintiff countered that the settlement with the nursing homes was not an automatic bar to its malpractice suit against Squitieri. Plaintiff contended that, like the plaintiff in Ziegelheim, it attempted to remedy its counsel's negligence at the trial court  the Ziegelheim plaintiff filed a motion to set aside an ill-advised and inadequate matrimonial settlement her attorney had recommended, and Prospect filed a motion to amend its complaint to include the omitted Medicare reimbursement claims its principal contended Squitieri was aware of from the outset. When the trial court denied plaintiff's motion, as it did in Ziegelheim, plaintiff argued it thus should have been entitled to the same relief of pursuing a legal malpractice action against its former counsel. Plaintiff distinguished Puder, emphasizing that it never represented the settlement to be a fair resolution of its underlying claims with the nursing homes, but only a mitigation of damages after plaintiff lost the trial court motion to amend its complaint.
Plaintiff further contended its malpractice action was its only viable remedy to Squitieri's negligence. Plaintiff argued it was not required as a matter of law to exhaust its appellate remedies or continue the prophylactic, and potentially frivolous, subsequent lawsuits against the nursing homes to perfect its legal malpractice claim. Rather, plaintiff contended, it only was required to take reasonable steps to avoid the consequences of its former attorney's tortious conduct before it sued the attorney for malpractice. See Spaulding v. Hussain, 229 N.J.Super. 430, 444, 551 A.2d 1022 (App.Div.1988) (holding that the plaintiff's inadequate settlement of his underlying claim at trial was a reasonable mitigation of damages in the professional malpractice action against his treating physician for failing to appear in court, as promised, because the plaintiff and his attorney were threatened with a "litigation catastrophe"); see also Covino v. Peck, 233 N.J.Super. 612, 619, 559 A.2d 868 (App. Div.1989) (holding that a client's legal malpractice action instituted after his attorney failed to file suit in New Jersey within the statute of limitations was a reasonable response to a "legal catastrophe" and was not barred by the doctrine of mitigation of damages although the client could have filed suit against one of the underlying tortfeasors in Mississippi, which had a longer statute of limitations; the client was not required to litigate in an inconvenient forum in an attempt to extricate the defendant from his own wrongful act). Cf. Puder, supra, 183 N.J. at 440, 874 A.2d 534 (finding that unlike the plaintiff in Spaulding, Mrs. Buechel was not confronted with a "litigation catastrophe" that required her to accept a lesser settlement and pursue the perceived difference in future litigation because the trial court had not decided her motion to vacate the first settlement agreement).
Plaintiff asserted there were genuine issues of material fact as to whether the steps taken to protect its judgment, obtain additional funds, and avoid further expenditure of counsel fees by settling with the nursing homes in the underlying case, as determined from its point of view, Covino, supra, 233 N.J.Super. at 619, 559 A.2d 868, were reasonable. As such, plaintiff urged, the matter was not appropriate for summary judgment.
The trial court granted summary judgment to Squitieri, concluding that, having made a "calculated decision" to settle the Medicare denial claims with the nursing homes for less than what it knew they were worth, despite the opportunity to proceed with its appeal and lawsuits, plaintiff was estopped from asserting its claim against Squitieri. The court stated that, as in Puder, it would be improper to permit the plaintiff, with advice of new *140 counsel, to voluntarily accept an inadequate settlement of the underlying claims under these circumstances and then seek to recoup the difference in a malpractice action against its former attorney. The court additionally made a determination as to the merits of plaintiff's pending Appellate and Law Division actions, stating:
Although the original Complaint did not include the Medicare denial claims, the instant action against [Squitieri] was not plaintiff's only remedy to the alleged malpractice, as plaintiff had a meritorious appeal and two separate lawsuits in which it could have litigated those claims.
. . . .
As to plaintiff entering into the settlement with the underlying nursing homes based upon a "judgment call" that the Appellate Division and trial court in the separate actions would find against it, there is no credible evidence that the Appellate Division or trial court intended to rule against plaintiff in the appeal or the two separate lawsuits. In fact, the existing legal precedent with respect to the amendment of pleadings, as well as the Appellate Division's holdings, would support plaintiff's argument for the reversal of the order denying the amendment of the underlying Complaint. See Howard v. University of Medicine & Dentistry of New Jersey, 338 N.J.Super. 33, 37-38, 768 A.2d 195 (App.Div.2001); Zacharias v. Whatman PLC, 345 N.J.Super. 218, 226, 784 A.2d 741 (App.Div.2001). Further, the fact that the underlying nursing homes paid $40,000 to settle the Medicare denial claims is evidence itself that the appeal and separate lawsuits had a good chance of success.
The court memorialized its decision in an order of January 20, 2006, dismissing plaintiff's complaint with prejudice.
On appeal, plaintiff raises many of the same issues argued before the trial court in opposition to Squitieri's summary judgment motion. Plaintiff contends that under Ziegelheim, its legal malpractice action is not barred by acceptance of the inadequate settlement of the underlying claims and that the trial court erroneously dismissed its complaint in reliance on Puder, which is factually and legally distinguishable. Firstly, plaintiff never represented that the settlement it reached with the nursing homes in June 2003, was an acceptable settlement or a fair resolution of its underlying claims. Secondly, the settlement was intended solely as a mitigation of damages in response to a series of "litigation catastrophes" commencing with Squitieri's alleged negligence in failing to assert $400,000 worth of claims against the nursing homes. Finally, the settlement was entered into after the trial court denied plaintiff's motion for leave to amend its complaint to assert the omitted Medicare claims, and on the eve of an anticipated summary judgment dismissal of a potentially frivolous subsequent lawsuit asserting the same claims.
Plaintiff further contends the court erred in finding on summary judgment based on estoppel that it had other remedies to Squitieri's malpractice that it chose not to pursue. Plaintiff reiterates that it is not required to exhaust its appellate remedies or re-sue the nursing homes to perfect its legal malpractice claims, but only is required to take reasonable steps to avoid the consequences of its former attorney's tortious conduct. Plaintiff submits there are factual issues as to whether the steps it took in response to the "litigation catastrophes" of Squitieri's negligence, denial of the motion to amend the pleadings, and the impending summary judgment motion by the nursing home were reasonable from plaintiff's point of view. Plaintiff also argues *141 that the trial court's conclusion that plaintiff would have prevailed in its appeal represents "naked overly optimistic speculation" and that it would have been permitted to litigate the Medicare reimbursement claims in the separate Law Division actions represents "plain error."
For purposes of the summary judgment motion, we view the facts in the light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Squitieri was informed from the outset of plaintiff's potential additional $400,000 claims against the nursing homes, which he failed to include in the complaint. Plaintiff's new attorney attempted to rectify Squitieri's negligence by filing a motion to amend the complaint to assert the omitted claims, which was denied by the trial court. After plaintiff successfully obtained a verdict on the claims asserted in its complaint, it filed an appeal of the trial court's denial of its motion to amend and the nursing homes filed a cross-appeal. To preserve the statute of limitations, plaintiff then refiled the same barred claims against parties in privity with the nursing homes sued by Squitieri, which suits were subject to summary judgment dismissal under the entire controversy doctrine and related grounds. Plaintiff was faced with a decision of whether to proceed with litigation of its underlying claims or attempt to negotiate a settlement with the nursing homes. Plaintiff reasoned that its appeal had a lower probability of success because it involved a discretionary ruling by the trial court, who created a detailed record of its reasoning, and considered a variety of other reasons justifying dismissal of the appeal. Moreover, there was no doubt the Law Division suits would either be dismissed on summary judgment or voluntarily dismissed by plaintiff because, as certified to by Kravitz, "there was no conceivable basis for such claims given that the defendants [in the second action] acknowledged that they were the same parties named in the First Action." Plaintiff thus determined it had used its best efforts to mitigate its damages caused by the litigation catastrophes put into play by Squitieri's negligence in failing to include the $400,000 worth of claims in the initial suit. It negotiated the best settlement of the underlying case it was able to obtain under the circumstances, knowing it was inadequate and was not a fair resolution of its claims against the nursing homes, and pursued its malpractice action.
We are persuaded by many of plaintiff's arguments and are satisfied the complaint should not have been dismissed on summary judgment. This case is factually and legally distinguishable from Puder and does not have the "fairness and the public policy [considerations] favoring settlements" or the equities that pervaded that case. Plaintiff's principal never represented to anyone, let alone a court, that its settlement with the nursing homes was a "fair" and satisfactory resolution of its underlying claims. Nor by now suing Squitieri for malpractice is plaintiff seeking to profit from litigation positions that are "clearly inconsistent and uttered to obtain judicial advantage." Puder, supra, 183 N.J. at 444, 874 A.2d 534 (quoting Newell v. Hudson, 376 N.J.Super. 29, 46, 868 A.2d 1149 (App.Div.2005)). Moreover, plaintiff did not settle the underlying suit with the nursing homes prior to the trial court ruling on its motion to amend the complaint to assert the omitted Medicare-denied claims. That plaintiff chose to take the further steps and appeal the trial court's denial of its motion to amend and to file the subsequent lawsuits to preserve the statute of limitations on its underlying claims, and thereafter decided, for a variety of reasons, to settle with the nursing homes prior to obtaining judicial determinations *142 did not, under the circumstances of this case, preclude plaintiff's malpractice claim as a matter of law.
The trial court should have evaluated whether plaintiff took reasonable steps, from plaintiff's point of view, to remedy Squitieri's alleged negligence before pursuing its malpractice action, which presented factual issues that could not be decided on this record on summary judgment. Instead, the court erroneously assumed as a matter of law under Puder that by filing the appeal and subsequent lawsuits, plaintiff had other forums in which to pursue its underlying claims, which it voluntarily chose not to pursue, and thus it was estopped from now proceeding against Squitieri. Moreover, the record does not support the court's finding as to the viability of the two Law Division actions. On the contrary, we are satisfied there was credible evidence the complaints would not withstand Dellridge nursing home's May 2003, dismissal motion. There was also an insufficient basis for the court's finding on summary judgment that plaintiff had a good chance of success on its appeal.[3] We do not believe the case law is as clear-cut as stated by the court. Expert testimony will most likely be required to assist the jury to determine the merits of plaintiff's appeal of the underlying case and the potential for reversal of the motion judge's denial of leave to amend the complaint, as well as the merits of the nursing home's cross-appeal of the jury verdict. Furthermore, in assessing the reasonableness of plaintiff's actions, the jury will also need to analyze all of the considerations that entered into plaintiff's decision to settle the underlying case and dismiss the appeal, including the amount of the settlement.
We reverse the summary judgment dismissal of plaintiff's malpractice complaint and remand for further proceedings. Plaintiff will proceed to prove Squitieri's malpractice by way of the suit-within-a-suit or other appropriate format. Garcia v. Kozlov, Seaton, Romanini, & Brooks, P.C., 179 N.J. 343, 358, 845 A.2d 602 (2004). Defendant has the right to assert, among its other defenses, that it was unreasonable for plaintiff to settle the underlying case and dismiss the appeal, including that the amount of the settlement was unreasonable.
Reversed and remanded.
NOTES
[1] The parties' Provider Service Agreement entered into in 1996 require each facility to "[e]nsur[e] that all official documentation completed on individual patients are certified by the attending physicians and made a part of the patient's chart in accordance with Federal, State, and Medicare regulations."
[2] The nature of this affirmative defense was that the parties' oral agreement to temporarily change the rent from $7,000 a month to $13,000 a month calculated to about $200 per square foot, which could not be construed as anything other than a kickback to the nursing home.
[3] There may be cases where the error by the trial judge is so patent or egregious, i.e., every third motion is denied, the ruling is based solely on a case that previously had been reversed, or there are no findings whatsoever supporting the decision, in which a court could find as a matter of law that a reasonable mitigation of damages obligates the movant to file an appeal and exhaust its appellate remedies prior to instituting a malpractice action against the former attorney. That, however, was not the situation here.