995 A.2d 844

JOSEPH M. GUIDO AND TERESA GUIDO, HUSBAND AND WIFE, PLAINTIFFS-RESPONDENTS, v. DUANE MORRIS LLP A LIMITED LIABILITY PARTNERSHIP, FRANK A. LUCHAK, ESQ., AND PATRICIA KANE WILLIAMS, ESQ., DEFENDANTS-APPELLANTS.

Argued January 20, 2010—Decided June 3, 2010—As Corrected June 8, 2010.

*Joseph P. La Sala* argued the cause for appellants (*McElroy, Deutsch, Mulvaney & Carpenter, LLP,* attorneys; *Mr. La Sala, William F. O'Connor, Jr.,* and *James J. DiGiulio,* on the brief).

*Donald P. Fedderly* argued the cause for respondents.

*Diana C. Manning* argued the cause for amicus curiae Trial Attorneys of New Jersey (*John C. Simons,* President, attorney; (*Ms. Manning* and *Mr. Simons,* on the brief).

*Robert B. Hille* argued the cause for amicus curiae New Jersey State Bar Association (*Allen A. Etish,* President, *Graham Curtin, Kalison, McBride, Jackson & Murphy,* and *Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman,* attorneys; *Mr. Hille, Mr. Etish,* and *Christopher J. Carey,* of counsel; *Mr. Hille, Mr. Carey, Theodore H. Hilke, Evelyn R. Storch,* and *Paul L. Croce,* on the brief).

Justice RIVERA–SOTO delivered the opinion of the Court.

In this appeal, we revisit the effect, if any, the settlement of an underlying lawsuit has on a subsequent legal malpractice action arising out of that settled lawsuit. In *Puder v. Buechel,* 183 *N.J.* 428, 874 *A.*2d 534 (2005), we determined that a client's unconditional declaration of satisfaction with the fairness and terms of a settlement of a lawsuit precludes a later legal malpractice action based on that settlement. Unlike *Puder* and its predecessor *Ziegelheim v. Apollo,* 128 *N.J.* 250, 607 *A.*2d 1298 (1992), the client in this case did not seek to vacate or otherwise repudiate the settlement entered into in the earlier lawsuit. Instead, the client alleged that he entered into the now complained-of settlement based on negligent advice from his lawyers. In those circumstances, we conclude that a legal malpractice plaintiff need not first seek to vacate a settlement, but may proceed directly against those lawyers the plaintiff asserts provided the negligent advice that culminated in the settlement.

## I.

Because this appeal arises from the trial court's grant of reconsideration of a summary judgment determination—where the trial court first granted defendants' motion for summary judgment and, on a motion for reconsideration, vacated that judgment—we must consider the facts in the light most favorable to the non-moving party. *Roa v. Roa,* 200 *N.J.* 555, 562, 985 *A.*2d 1225 (2010); *Lee v. First Union Natl. Bank,* 199 *N.J.* 251, 254, 971 *A.*2d 1054 (2009); *Leang v. Jersey City Bd. of Educ.,* 198 *N.J.* 557, 567–68, 969 *A.*2d 1097 (2009).

We need not recite at length the rather tortured factual history of this appeal, as its procedural history is more germane to the issues on appeal. Suffice it to note that plaintiff Joseph Guido [1]

---

[1] Although Theresa Guido, Joseph Guido's wife, is also a named plaintiff in the legal malpractice action from which this appeal was taken, a review of the malpractice complaint does not disclose that she had an active role in the

was the majority shareholder and chairman of the board of directors of Allstates Worldcargo, Inc. (Allstates).  In October 2004, plaintiff sued Allstates and several of its officers and directors, alleging certain corporate governance concerns.  On October 27, 2004, the day before the return date on plaintiff's order to show cause, James J. Ferrelli, Esq., a lawyer with and a partner in defendant Duane Morris, LLP (the Law Firm),[2] wrote to plaintiff and explained as follows:

> I previously faxed you a copy of the Voluntary Dismissal without Prejudice, and will file that with the Court tomorrow morning per our discussion this afternoon. That will end the current case against the defendants and would enable you to reinitiate action in the event that you do not come to written terms with the defendants, or assert other claims as you advised you may want to do.
>
> As we discussed this afternoon, *we advise against any agreement* with [the president and also a member of the board of directors of Allstates] and the [other] defendants *that includes as a term any limitation on your rights as majority shareholder of Allstates,* whether to change the composition of the Board of Directors, otherwise amend the By–Laws, or take other action.  In essence, *by requesting that you agree to such terms, [the president of Allstates] is taking away your ability to control the company, which substantially undermines your majority ownership.*
>
> [ (Emphasis supplied).]

Ferrelli's letter was prophetic.  He explained further that "[i]f the case is not dismissed or settled on the record, the Court will order mediation."  He noted that, "[i]f mediation were to proceed, an impartial mediator would be appointed to help the parties reach an agreement."  He reasoned that "[t]his would be one way for you to obtain a better settlement with [the president of Allstates], one that protects your interests and does not diminish the value of your stock."  He remarked further:

> We understand that [the president of Allstates] is talking about extending your employment agreement for five (5) years and increasing your salary.  He also

---

determinations and prosecution of the underlying actions, although she is alleged to have been affected economically by them.  For ease of understanding, all references to "plaintiff" refer solely to plaintiff Joseph Guido, and all references to "plaintiffs" include plaintiff Theresa Guido.

[2] Although plaintiff's malpractice complaint names the Law Firm and two of its lawyers as defendants, Ferrelli is not a named defendant.

wants you to enter into an agreement not to vote your stock in anyway that would increase the Board without the consent of all Board members.

*A binding agreement limiting how you vote your stock severely diminishes the value of your stock,* which we understand is your primary asset. [The president of Allstates] is not offering to pay you for this. Rather, in return for an agreement which will reduce and possibly destroy the value of your stock, [the president of Allstates] is offering a five (5) year employment contract and a to-be-determined raise.

*In lieu of an agreement not to change the board of directors, we believe that you should be exploring other alternatives,* including a sale of the company and/or the sale of your stock. If [the president of Allstates] wants to control the company and limit your rights as majority shareholder to do so, he should pay you for that by buying your stock or arranging for a sale of the company. Such options could be pursued through mediation.

[ (Emphasis supplied).]

Ferrelli's letter concluded as follows:

The ultimate decision is, of course, yours. However, we recommend that if you settle, you do so without undermining your ability and right as majority shareholder to change the board of directors, amend the By–Laws, or take other appropriate action, and that you take all steps to protect, to the greatest extent possible, the value of your stock. You should also obtain repayment of your attorneys' fees, as provided in your Employment Agreement.

The next day, on October 28, 2004 and as foreseen by Ferrelli, the trial court denied plaintiff's request for temporary restraints and referred the matter to mediation; the parties entered into a voluntary dismissal without prejudice, as provided in *Rule* 4:37–1(a); and entered into a settlement that was placed on the record. The parties, however, were unable to reduce the settlement terms to writing and, ultimately, Allstates "withdr[e]w [its] settlement proposal and elect[ed] to proceed with the litigation of this matter."

As a result, in February 2005, plaintiff filed a second suit against Allstates, again seeking injunctive relief; that complaint was filed by the Law Firm, was signed by defendant Frank A. Luchak, and was verified by plaintiff. The trial court also referred that action to mediation, which ultimately resulted in the settlement plaintiff now claims was inadequate due to defendant's failure to represent plaintiff in a competent manner. That settlement incorporates all of the items that caused concern to, and were counseled against by, Ferrelli in his letter to plaintiff. At a

hearing held on April 5, 2005 where plaintiff was represented by Luchak and defendant Patricia Kane Williams, both of whom were lawyers from the Law Firm,[3] the terms of the settlement reached before the mediator were placed on the record. Following that, the trial court addressed plaintiffs as follows:

THE COURT: Mr. and Mrs. Guido, you've had an opportunity to come to court on two or three occasions. You've also had settlement discussions on your own, and you've also had the assistance of [retired] Judge Havey in mediating this and bring closure in accordance with the terms that were described in court. Did you understand the terms?

MR. GUIDO: Yes, sir.

MRS. GUIDO: Yes.

THE COURT: You do. Is there any question you have?

MR. GUIDO: No, sir.

THE COURT: No. Mrs. Guido?

MRS. GUIDO: No.

THE COURT: And you agree to be bound by those terms?

MR. GUIDO: Yes, sir.

THE COURT: And you're both in reasonably good health, there's nothing that would impact your ability to understand the terms and accept responsibility for the terms, as well as the fruits of this agreement; is that acceptable to you?

MR. GUIDO: Yes, sir.

THE COURT: Mrs. Guido?

MRS. GUIDO: Yes.

THE COURT: All right. Counsel, do either of the [p]laintiff's [c]ounsel wish to supplement my series of questions in any way? Either side?

MR. LUCHAK: I have no further questions.

THE COURT: Okay. [Counsel for Allstates]?

[COUNSEL]: No. sir.

Almost two years later, on February 15, 2007, plaintiffs filed their legal malpractice complaint against the Law Firm, Luchak and Williams, claiming that defendants "failed to exercise the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated, and failed to employ reasonable care and prudence in connection with their

---

[3] Ferrelli's October 27, 2004 letter to plaintiff identifies the Law Firm as "a Delaware limited liability partnership" and Luchak as its New Jersey "resident partner."

representation of" plaintiffs. Based on that claimed breach of duty, plaintiffs sought both compensatory damages and a refund of approximately $358,000 in legal fees plaintiffs paid defendants; plaintiffs also sought "attorneys' fees, costs of suit, and such other and further relief as the Court deems just and proper."

Defendants moved for summary judgment, pursuant to *Rules* 4:46–1 and –2. By a letter opinion and order dated June 11, 2008, the trial court entered summary judgment in favor of defendants and dismissed plaintiffs' complaint with prejudice. Acknowledging that "there is a genuine issue of material fact as to whether or not the defendants adequately advised plaintiffs of the impact the voting agreement would have on the value of their shares, and whether or not the failure to do so constitutes legal malpractice[,]" the trial court, relying on *Puder, supra,* and *Prospect Rehabilitation Services, Inc. v. Squitieri,* 392 *N.J.Super.* 157, 920 *A.*2d 135 (App.Div.), *certif. denied,* 192 *N.J.* 293, 927 *A.*2d 1292 (2007), nevertheless concluded that "a [p]laintiff must take reasonable steps to avoid the consequences of a former attorney's tortious conduct before suing the attorney for malpractice." It reasoned that plaintiffs "testified before [the settlement hearing judge] that they understood and agreed to be bound by the terms of the settlement agreement." It noted that "[plaintiffs] never sought to vacate or set aside the underlying settlement, nor did they take any reasonable steps to remedy the purported negligence of their attorneys. Instead, [plaintiffs] filed this malpractice action[.]" Believing that efforts to vacate a prior settlement are an indispensable condition precedent to an action which alleges that the prior settlement was the result of legal malpractice, the trial court granted defendants' motion for summary judgment and dismissed plaintiffs' complaint "in its entirety with prejudice[.]"

Plaintiffs moved for reconsideration. Based on *Hernandez v. Baugh,* 401 *N.J.Super.* 539, 951 *A.*2d 1095 (App.Div.2008), the trial court granted reconsideration, and vacated its earlier order. In *Hernandez,* the Appellate Division had reversed the entry of summary judgment in favor of a defendant/lawyer. *Id.* at 543, 951

*A.*2d 1095. It distinguished *Puder* on the basis that, unlike *Puder*—where the client testified that a settlement of her claim on essentially the same terms as an earlier settlement the client later claimed was the product of malpractice was fair and reasonable, *Puder, supra,* 183 *N.J.* at 432–35, 874 *A.*2d 534—the plaintiff in *Hernandez* "was compelled to settle his [earlier] action because the negligence of defendant deprived him of the proofs he needed to prevail." *Hernandez, supra,* 401 *N.J.Super.* at 542, 951 *A.*2d 1095. Applying *Hernandez,* the trial court explained that plaintiffs "assert[ ] that [d]efendant[s] had failed to properly advise him as to the terms and the consequences of the agreement which [plaintiff] freely entered into." It noted that it "had previously determined that because [p]laintiffs failed to vacate the settlement in the Chancery Division, this would prohibit the malpractice action against [d]efendants." It defined the "issue [a]s whether or not the actions taken by [p]laintiff to avoid the malpractice action w[ere] reasonable and [p]laintiff rightly argues to the Court that an application to the Chancery Division to vacate the Order because the attorney was negligent would be without merit." The trial court agreed, declaring that, "[i]n fact, it would be an exercise in futility to do so."

Defendants sought leave to appeal that interlocutory order, which was granted. In an unpublished opinion, the Appellate Division affirmed the trial court's conclusions. As a threshold matter, the panel concluded that it was proper for the trial court to have considered and granted plaintiffs' reconsideration motion. It noted that a "motion for reconsideration under *Rule* 4:49–2 . . . is a matter left to 'the trial court's sound discretion' " (quoting *Capital Fin. Co. of Del. Valley, Inc. v. Asterbadi,* 398 *N.J.Super.* 299, 310, 942 *A.*2d 21 (App.Div.), *certif. denied,* 195 *N.J.* 521, 950 *A.*2d 907 (2008)). It emphasized that a motion for reconsideration "is not properly brought simply because a litigant is dissatisfied with a judge's decision, nor is it an appropriate vehicle to supplement an inadequate record." It explained that a reconsideration motion "is primarily an opportunity to seek to convince the court that either 1) it has expressed its decision based upon a palpably

incorrect or irrational basis, or 2) it is obvious that the court either did not consider, or failed to appreciate the significance of probative, competent evidence" (citations, internal quotation marks and editing marks omitted).  It noted further that, in the context of a motion for reconsideration, "[a] litigant may also bring up new matter that was not available when the initial motion was filed" (citing Pressler, *Current N.J. Court Rules*, cmt. 2 on *R.* 4:49–2 (2008)).

Applying those precepts, the Appellate Division reasoned as follows:

> It appears from the record that an important issue on the merits of the defendants' motion for summary judgment, whether plaintiffs had an obligation to seek to set aside the settlement in the General Equity case, was not raised by the defendants in their initial summary judgment brief.  Consequently, plaintiffs may not have had an adequate opportunity to brief the issue in connection with their opposition to the summary judgment motion.  In addition, the case upon which the motion judge relied in granting reconsideration, *Hernandez v. Baugh*, *supra*, was not decided until after the reconsideration motion itself was filed.  Consequently, it could not have been brought to the motion judge's attention on the original summary judgment motion.

Based on that reasoning, the panel concluded that "[u]nder all of those circumstances, we see no abuse of discretion in the motion judge's decision to reconsider his summary judgment order."

Addressing the substance of defendants' summary judgment motion, the Appellate Division, after stating the proper standard of review on appeal, "note[d], as did the motion judge, that there is a genuine issue of material fact as to whether or not the defendants adequately explained the long-term implications of the settlement to" plaintiffs.  Specifically, the panel identified "whether defendants adequately explained that the settlement's new restrictions on the sale of stock would have a significant adverse impact on the value and marketability of [plaintiff]'s majority ownership interest, as well as his wife's minority interest" and that "some of those long-term implications, such as those related to the value of the stock, would not necessarily have been obvious from the settlement terms themselves."  It acknowledged that "other aspects of the settlement were clear from the settlement terms,

*e.g.,* the procedures for amending the by-laws, the size of the board, and the method of appointing the additional members."

Turning to defendants' assertion, based on *Puder,* that "even if there is such a genuine issue of material fact, [plaintiffs] cannot pursue their malpractice claim because they voluntarily accepted the settlement in the General Equity action[,]" the panel distinguished *Puder,* stating that, in "the present case ... there was no 'litigation catastrophe[.]' " It reasoned that, "[i]n this case, although [plaintiff] was aware that he was giving up certain rights inherent in majority ownership" (footnote omitted), a significant difference is present: plaintiff "specifically contends that he was not aware of the effect the restrictions on the sale of stock and other provisions of the voting agreement would have on the value of his investment at the time he agreed to the settlement of the General Equity action" and that defendants "were negligent in failing to advise him in that regard." The panel concluded that, "[t]o that extent, the present case is more like *Ziegelheim,* at least with respect to the matters not clear from the terms of the settlement agreement."

The Appellate Division recognized that, "[u]nlike the malpractice claimants in both *Ziegelheim* and *Puder,* [plaintiffs] did not seek to repudiate the settlement in the underlying action." It thus focused on the issue before it: "whether such an effort is a condition precedent to the filing of a malpractice action, as defendants argue." The panel "conclude[d] that it is not[,]" highlighting that "[c]ertainly, there is no such requirement specifically articulated in *Puder.*" Contrasting *Ziegelheim* and *Puder,* the panel found "no basis in the record before us to believe that the General Equity judge would, after almost two years, have set aside the settlement of [plaintiffs'] General Equity action[.]" In reaching that finding, the panel placed great weight on "the extensive settlement negotiations and mediation that had preceded [the settlement] and the fact that the judge had already enforced its terms when the parties had difficulties agreeing on the written settlement agreement." It therefore "conclude[d] plaintiffs had no

reasonable expectation of success on a motion to set aside the General Equity settlement, and consequently had no obligation to make such an application" (citing *Prospect Rehab. Servs., supra,* 392 *N.J.Super.* at 163–64, 920 *A.*2d 135; *Covino v. Peck,* 233 *N.J.Super.* 612, 619, 559 *A.*2d 868 (App.Div.1989)).

The panel noted that "[i]t appears that the parties and the motion judge viewed the governing law as requiring that all aspects of the malpractice claim in [plaintiffs'] complaint be treated the same. We do not." It reasoned that,

> [r]eading *Ziegelheim* and *Puder* together, we understand the Supreme Court to permit malpractice claims following a settlement when there are "particular facts in support of their claims of attorney incompetence," *Ziegelheim, supra,* 128 *N.J.* at 263, 607 *A.*2d 1298, but to preclude malpractice claims when a client merely seeks to "settle a case for less than it is worth ... and then seek[s] to recoup the difference in a malpractice action against [the] attorney." *Puder, supra,* 183 *N.J.* at 442, 874 *A.*2d 534.

It further concluded that, "[e]xpressed another way, ... a malpractice action cannot simply serve as a remedy for a litigant who has changed his or her mind about the merits of a settlement previously accepted, *i.e.,* someone now suffering from the litigation equivalent of 'buyer's remorse.'" It noted that, "[i]nstead, there must be one or more specific allegations of malpractice that negate the element of prior acceptance of the underlying settlement." Applying those principles, the panel found that "the allegation that the defendants failed to explain the long-term value and marketability implications of the stock restrictions on the sale of the stock to be sufficient for the matter to proceed" (footnote omitted). It cautioned, however, that "[w]hether [plaintiffs'] other allegations, such as those related to [plaintiff]'s ability to amend the by-laws or elect members of the board, qualify under the *Ziegelheim–Puder* analysis must be determined by the trial court on a fuller record." It therefore "affirmed the motion judge's grant of the motion for reconsideration and his denial of summary judgment."

Defendants sought leave to appeal, which we granted. *Guido v. Duane Morris, LLP,* 200 *N.J.* 468, 983 *A.*2d 196 (2009). We also granted leave to appear as amicus curiae to the Trial Attorneys of New Jersey and to the New Jersey State Bar Association. For

the reasons that follow, we affirm the judgment of the Appellate Division.

## II.

Defendants present two principal substantive arguments. First, defendants assert that plaintiffs' legal malpractice claim is barred as a matter of law by *Puder* because, like *Puder*, plaintiffs twice entered into the settlement agreement about which they now complain. Second, defendants claim that plaintiffs' failure to seek to vacate the settlement precludes a subsequent legal malpractice action in respect of that settlement; relying on a reference in the dissenting opinion in *Puder, supra,* 183 *N.J.* at 448, 874 *A.*2d 534, and an unpublished opinion from the Appellate Division,[4] defendants argue that plaintiffs' "failure to exhaust all corrective remedies bars [p]laintiffs' legal malpractice claims."

Plaintiffs respond that the Appellate Division correctly analyzed their claims under *Ziegelheim,* and not *Puder,* and that plaintiffs were under no obligation to seek to vacate the underlying settlement before instituting their legal malpractice complaint against defendants.

Amicus the Trial Attorneys of New Jersey (TANJ) urges that "litigants should first be required to seek enforcement and/or a modification of a settlement before the court of original jurisdiction, and that failure to do so within two years of the settlement would preclude the filing of a legal malpractice action premised on an alleged misunderstanding of a settlement's terms." Asserting that "[s]uch a Rule would provide the consistency and finality both litigants and attorneys expect from a settlement agreed to and accepted on the record before a court of this State[,]" TANJ

---

[4] A dissent, of course, is not precedent; also, we reject the use of unpublished decisions as precedent. *See R.* 1:36–3 (explicitly providing that "[n]o unpublished opinion shall constitute precedent or be binding upon any court" and, save for certain limited exceptions inapplicable here, "no unpublished opinion shall be cited by any court").

argues that sustaining the Appellate Division's decision here will have a significant, detrimental effect on the trial bar and court calendars; will undermine the integrity of the judicial process; and will undermine the integrity of the mediation process.

Amicus the New Jersey State Bar Association (NJSBA) urges that "[t]he Appellate Division's holding undermines the policy objectives outlined by the Supreme Court in *Puder* [,] which sought to preserve the integrity of settlements and avoid converting lawyers [in]to insurers of those agreements." NJSBA argues that "a strong policy statement is warranted to guide lower courts in how to avoid duplicative legal malpractice suits which serve neither the parties nor society as a whole." It reasons that parties who claim they entered into a settlement based on inadequate or incorrect legal advice should be required to seek to vacate that settlement before a legal malpractice case can be entertained; by doing so, it asserts, "[s]ettling parties are held accountable for their decisions and duplicative suits are eliminated since advice that is truly inadequate justifies setting aside the agreement."

## III.

In order to unravel the needlessly complicated procedural background presented in this appeal, a return to bedrock principles is required. It is to those principles that we now turn.

The standards for determining whether a client can maintain a legal malpractice action against a lawyer who counseled a settlement are set forth clearly in *Ziegelheim*. There, a party dissatisfied with a settlement sought to sue her former lawyer for alleged malpractice that culminated in a settlement. *Ziegelheim, supra,* 128 *N.J.* at 254–58, 607 *A.2d* 1298. Prior to proceeding with her malpractice complaint, the client moved to set aside the settlement; that motion was denied, as the settlement was judicially decreed to have been " 'entered into ... after extensive negotiations'" where the client had " 'unequivocally stated that she

accepted the settlement without coercion.'" *Id.* at 258, 607 *A.*2d 1298.

Outright rejecting "the rule ... that a dissatisfied litigant may not recover from his or her attorney for malpractice in negotiating a settlement that the litigant has accepted unless the litigant can prove actual fraud on the part of the attorney[,]" *id.* at 262, 607 *A.*2d 1298,[5] the Court in *Ziegelheim* concluded that "[t]he fact that a party received a settlement that was 'fair and equitable' does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." *Id.* at 265, 607 *A.*2d 1298. That said, the Court tempered its conclusion with the recognition that it was "not open[ing] the door to malpractice suits by any and every dissatisfied party to a settlement." *Id.* at 267, 607 *A.*2d 1298. The Court "acknowledge[d] that attorneys who pursue reasonable strategies in handling their cases and who render reasonable advice to their clients cannot be held liable for the failure of their strategies or for any unprofitable outcomes that result because their clients took their advice[,]" *ibid.*, explaining that "[t]he law demands that attorneys handle their cases with knowledge, skill, and diligence, but it does not demand that they be perfect or infallible, and it does not demand that they always secure optimum outcomes for their clients." *Ibid.*

More recently, the Court revisited the effect of a prior settlement in a subsequent malpractice action in *Puder, supra.* There, a dissatisfied client sought to sue her former lawyers over a rejected settlement despite the fact that she retained new lawyers, that those new lawyers negotiated a settlement that was substantively indistinguishable from the earlier rejected settlement, and that the client had represented to the trial court that the settlement was both fair and acceptable to her. *Puder, supra,* 183 *N.J.*

[5] *See, e.g., Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick,* 526 *Pa.* 541, 587 *A.*2d 1346 (1991).

at 431–36, 874 *A*.2d 534. In those circumstances, the Court, applying equitable principles, carved out a limited exception to the *Ziegelheim* standard and held that "fairness and the public policy favoring settlements dictate that [the malpractice plaintiff] is bound by her representation to the trial court that the divorce settlement agreement was 'acceptable' and 'fair[,]' " explaining that "[t]hose statements clearly reflect [the malpractice plaintiff]'s satisfaction with the resolution of her [prior litigation], and, therefore, preclude her malpractice claim against her former counsel." *Id.* at 437, 874 *A*.2d 534. The Court nonetheless emphasized that

> our holding in *Ziegelheim* was not meant to open the door to malpractice suits by any and every dissatisfied party to a settlement. That is precisely why the *Ziegelheim* Court explained that many malpractice claims could be averted if settlements were explained as a matter of record in open court in proceedings reflecting the understanding and assent of the parties. *Ziegelheim's* reasoning discourages malpractice litigation when a court finds that a plaintiff, although well aware that the attorney was negligent, nevertheless testifies under oath that the settlement was both acceptable and fair.
>
> [*Id.* at 443, 874 *A*.2d 534 (citation and internal quotation marks omitted).]

When viewed in its proper context—that *Puder* represents not a new rule, but an equity-based exception to *Ziegelheim's* general rule—the rule of decision applicable here is clear: unless the malpractice plaintiff is to be equitably estopped from prosecuting his or her malpractice claim, the existence of a prior settlement is not a bar to the prosecution of a legal malpractice claim arising from such settlement. Thus, if required "to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment[,]" *Knorr v. Smeal*, 178 *N.J.* 169, 178, 836 *A*.2d 794 (2003) (citing *Mattia v. N. Ins. Co. of N.Y.*, 35 *N.J.Super.* 503, 510, 114 *A*.2d 582 (App.Div. 1955)), our courts will intervene and preclude a party from advancing a claim. In a closely related vein, where a party has prevailed on a litigated point, principles of judicial estoppel demand that such party be bound by its earlier representations. *See McCurrie v. Town of Kearny*, 174 *N.J.* 523, 533–34, 809 *A*.2d 789 (2002) (concluding that "judicial estoppel precludes a party from taking a position contrary to the position he has already successfully es-

poused in the same or prior litigation" and "judicial estoppel is a doctrine designed to protect the integrity of the judicial process by not permitting a litigant to prevail on an issue and then to seek the reversal of that favorable ruling" (citation omitted)).

An application of those precepts leads to the conclusion that plaintiffs' malpractice claim should not be barred. Here, unlike in *Puder*, plaintiffs did not represent to the court that they were satisfied with the settlement, or that the settlement was fair and adequate. The entirety of the colloquy between the court and plaintiffs concerning the settlement addressed but two questions: whether plaintiffs understood and agreed to abide by the settlement terms, and whether plaintiffs were subject to any impediments in understanding those terms. Glaringly absent is any representation by plaintiffs that the settlement was "fair" and "adequate," a representation deemed crucial in *Puder*.

In addition, and provided that they are supported by sufficient credible evidence in the record, we are bound by the trial court's factual findings. *State v. Bogan*, 200 *N.J.* 61, 80, 975 *A.2d* 377 (2009); *Beck v. Beck*, 86 *N.J.* 480, 496, 432 *A.2d* 63 (1981) (quoting *State v. Johnson*, 42 *N.J.* 146, 199 *A.2d* 809 (1964)). In this case, that cautionary standard acquires added meaning, as the trial court unequivocally found that "there is a genuine issue of material fact as to whether or not the defendants adequately advised plaintiffs of the impact the voting agreement would have on the value of their shares, and whether or not the failure to do so constitutes legal malpractice[,]" and the Appellate Division concurred in that finding. In light of that finding, we perceive no principled basis to bar plaintiffs' malpractice claim.

Defendants and amici have urged, nevertheless, that as a condition precedent to the filing of a malpractice case arising from a judicially accepted settlement, this Court should require that the malpractice plaintiff first try to vacate the settlement, and that a malpractice claim should lie only if those efforts fail. Although whether a malpractice plaintiff in fact has sought to vacate a prior

settlement may be a relevant factor, *see, e.g., Ziegelheim, supra,* 128 *N.J.* at 257, 607 *A.*2d 1298 (explaining that, before filing malpractice complaint at issue, malpractice plaintiff unsuccessfully had sought to set aside prior settlement), the failure to do so cannot be, in and of itself, dispositive.

The facts in this case mandate that we reject defendants' and amici's blanket invitation. Here, as the Appellate Division aptly concluded, "plaintiffs had no reasonable expectation of success on a motion to set aside the General Equity settlement, and consequently had no obligation to make such an application" (citing *Prospect Rehab. Servs., supra,* 392 *N.J.Super.* at 163–64, 920 *A.*2d 135; *Covino v. Peck,* 233 *N.J.Super.* 612, 619, 559 *A.*2d 868 (App.Div.1989)). Because " 'the law does not compel one to do a useless act[,]' " *United States v. Scurry,* 193 *N.J.* 492, 506, 940 *A.*2d 1164 (2008) (quoting *Albert v. Ford Motor Co.,* 112 *N.J.L.* 597, 603, 172 *A.* 379 (E. & A.1934)), requiring that a malpractice plaintiff first engage in what may well be the barren exercise of seeking to vacate a settlement is both wasteful and unnecessary. No doubt, there may be circumstances in which a malpractice plaintiff's failure to mitigate his or her damages by seeking to vacate the settlement that gives rise to the malpractice claim may be relevant. However, because that action logically cannot be a prerequisite for all malpractice claims based on a settlement, it also cannot rise to the level of a condition precedent to a malpractice suit. In that respect, the reasoning that informs the Appellate Division's decisions in *Hernandez, supra,* and *Squitieri, supra,* is most persuasive: the absence of efforts to set aside a settlement does not serve as an automatic bar to a later claim that the settlement was procured through an attorney's malpractice.

We repeat that the standard in respect of whether a malpractice plaintiff may maintain a suit based on a settlement remains as set forth in *Ziegelheim,* and that *Puder* represents but an equitable exception to *Ziegelheim's* overarching rule. Because the equitable considerations that animated our decision in *Puder* are absent here, we apply *Ziegelheim's* rule without exception and conclude—

without intimating any view as to the merits of plaintiffs' substantive claim—that the trial court and the Appellate Division correctly held that plaintiffs' malpractice claim is not barred as a matter of law.

## IV.

The judgment of the Appellate Division is affirmed, and the case is remanded to the trial court for further proceedings consistent with the principles to which we have adverted.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, ALBIN, RIVERA–SOTO and HOENS—5.

*Opposed*—None.