purposes of this opinion, we have viewed the facts in the light most favorable to Ramos.

Reversed and remanded.

56 A.3d 882

J.D., PLAINTIFF–APPELLANT, v. M.A.D., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted September 12, 2012—Decided October 19, 2012.

Before Judges SIMONELLI, ACCURSO and LISA.

*Forkin, McShane, Manos & Rotz,* attorneys for appellant (*Ronald N. Manos,* on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

ACCURSO, J.S.C. (temporarily assigned).

Plaintiff, J.D., appeals that portion of a domestic violence final restraining order entered on her application against her husband, defendant M.A.D., granting him exclusive possession of their marital home and temporary custody of their two children. Because that order denied the victim of domestic violence temporary custody of her children, contrary to the statutory presumption contained in *N.J.S.A.* 2C:25–29b(11), and restrained her from her home without statutory authorization, we reverse.

These are the facts found by the trial judge. The parties had been married for nine years when these events occurred and had two children, an eight-year-old boy and a four-year-old girl. In 2005, defendant was diagnosed with a very serious illness for which he received extensive treatment. At that time, plaintiff, who had been at home with the children, went back to work, taking a job with the Post Office as a letter carrier to help support the family. By 2010, defendant had largely recovered from his illness. Although he was unable to work and was receiving Social Security disability benefits, he was able to care for the children, oversee their activities and coach their athletic teams.

On February 6, 2011, defendant learned that his wife was having an extra-marital affair. She was in the shower on a Sunday morning when defendant found a message from a man on her cell phone. Defendant angrily confronted her and demanded to know the identity of the man. The couple's children were present. As plaintiff struggled to hold onto the towel that she had wrapped around her, defendant pushed her against a wall in their bedroom and put his hands around her throat, demanding to be told the man's name. When the parties' eight-year-old son saw his father screaming at his mother and trying to choke her, he called 911.

The police arrived shortly thereafter. After learning what had transpired, they persuaded defendant to leave the residence to cool off. Plaintiff later left with the children for a family birthday party. She was called back home several hours later, however, by defendant's mother. When she returned, she found the dresser in her bedroom overturned and the drawers empty. Her closet was also empty and the mattress had been pulled off the bed. Defendant had taken her clothes, pictures, and jewelry and burned them in the backyard. After being discovered, he had gone willingly with the police to a crisis center for evaluation. He was released from the crisis center the following day and returned home a few days later.

When defendant returned to the residence, the parties discussed their future. Plaintiff expressed remorse over the affair and said that she did not want to leave, but wanted to stay and work through their problems. Defendant said that he needed space in order to try to forgive her and asked her to leave. On February 21, 2011, the couple signed a one-page agreement, whereby plaintiff agreed to leave and have the children stay with defendant as the primary custodial parent. Plaintiff would have the children every weekend and on her day off once a week. Plaintiff left the following day.

The parties disputed when plaintiff returned home and whether it was permanent or intermittent. Based on the testimony of both parties, the court found that plaintiff remained away for at least a month before returning to join the family for dinner or their son's baseball games, and that she eventually resumed relations with her husband and was living with him in their home on a more or less constant basis as they made efforts to reconcile.

In July, the parties attended a professional baseball game with their children. On the way there, the parties engaged in what the court characterized as "verbal sparring," which started when defendant spotted a motel where he believed his wife had conducted her affair and directed her to look at it. Although the court did not credit plaintiff's testimony that her husband grabbed her hair,

and squeezed and held her hand next to his leg, defendant testified that he lifted her chin and pushed it towards the window in an effort to get her to acknowledge that she had stayed there. He further testified that he reached over and grabbed her hand and held it, explaining that he "wanted her to realize how much it hurts me. I wanted her to acknowledge it."

Although the judge did not include this incident among his findings of prior acts of domestic violence, because it did not rise to the level of an assault or harassment, we mention it here because it occurred in front of the parties' children. While the four-year-old was asleep, the couple's eight-year-old son was fully present and aware of the argument taking place between his parents. As the court noted, "the children were right there."

Later that month, a much more serious incident occurred. Early one morning, plaintiff was in the laundry room taking her uniform out of the dryer before work. Defendant came down the stairs yelling, "Is this what time you would leave?" He entered the laundry room and angrily pushed her so that she fell down amidst the laundry baskets. As she raised her arms to cover her face, defendant punched her three times with a closed fist, striking her in the upper arm. As she tried to get up, he pushed her back down into the laundry baskets while continuing to loudly ask, "Is this what time you would leave?"

On August 24, the couple celebrated their birthdays by taking the children out to dinner. After the family had returned home at 8:30 p.m., defendant announced that he was going out. When defendant returned home after midnight, after hours of drinking, plaintiff was in the couple's bed asleep with their daughter next to her. Defendant slapped her backside, in what the court charac-terized as a "rather rough way of getting someone's attention," and ordered her to go sleep on the couch. As she got up to go downstairs, defendant pushed her into the closet, put his hands around her throat and told her it was "his worst birthday ever." Although he let her go, defendant continued his tirade, calling her a whore, and causing their son to cry and ask why Daddy was

yelling at her. After plaintiff steered her son back to his room and laid down with him to try to get him to sleep, defendant came into the room and poked her in her chest with his finger, saying he was not done and that he wanted to talk to her.

Two weeks later, on September 9, 2011, plaintiff had put the children to bed and had taken a pillow and blanket to the couch to go to sleep. Defendant entered the room, and telling her that she "[did] not deserve to be comfortable," ordered her to the loveseat. Once she was settled on the loveseat, defendant came back and, profanely, told her that he wanted her to leave. He pulled her up off the loveseat by the shoulder, grabbed her hair, and pushed her, causing her to stumble. When she went to reach for the kitchen phone to call the police, defendant grabbed the phone from her hand and pulled the phone off the wall. The disturbance roused the couple's four-year-old daughter who came to stand sleepily nearby. Plaintiff sought and obtained a temporary restraining order on the following Monday, September 12, 2011.

After hearing three days of testimony over the course of three weeks and finding the facts above, the court concluded that plaintiff had proved by a preponderance of the evidence that defendant had committed an offensive touching on September 9, 2011, that he acted with a purpose to harass, and that a restraining order was necessary to prevent future acts of domestic violence. Specifically, the judge found

that the repeated acts of confrontation that the court has described and which [were] set forth in the testimony over the [preceding] seven months indicate that these two parties are going to continue to get into a—into physical—into arguments and perhaps in the future physical confrontations over the—over the adultery that has caused the defendant this level of concern.

The court then entertained argument "as to who should have possession of the marital home and as to who should have temporary custody of the children."

After hearing argument, the court determined to award temporary custody to defendant. The court found that defendant had become the primary caretaker for the children after his illness and plaintiff's having taken a job to support the family. The judge

emphasized that he was not faulting plaintiff for having taken a job, but merely concluding from the facts presented that defendant assumed the role of primary caretaker after plaintiff had gone to work. The court further found that the statutory presumption of *N.J.S.A.* 2C:25–29b(11), that the best interests of the child are served by awarding custody to the non-abusive parent, had been rebutted. The court stated:

> The court believes that the defendant's role with the children's life has been the central role. The court also believes that the defendant's anger issues are anger issues about one thing only. And that is why his—the marriage has broken up. The court believes that those anger issues have been expressed in one situation only when the two of you are present together.

The court went on to say that it did not recall defendant addressing the children about the couple's problems. When plaintiff's counsel objected, the court invited additional brief testimony from the parties on this topic. Plaintiff testified that after the children had spent time with defendant, her daughter told her, "Mommy if you don't drop this restroom [sic] order, Daddy will never be allowed to come home again." Her son then added, "Well, Daddy didn't grab your hand that hard in the car." Plaintiff also testified that shortly after the incident to which her son was referring occurred, he told her he wanted to "burn down Motel 6," and when she asked why, he responded, "[b]ecause that is where Daddy said you went." Defendant denied making any statements to the children, other than "the fact that every time I have them, they ask me when I'm coming home and I told them I can't."

The court then stated on the record that it adhered to its view that

> the presumption had been rebutted in this matter and that the defendant shall be the parent of primary residence of these children. Because the children need a place to live when they're in the primary residence of the defendant, the court believes that he should have possession of the home without prejudice to any future matrimonial action.

The court continued:

> [W]ith regard to the Motel 6 incident, the court has already credited the testimony of the defendant in that regard and that he did not, in fact, squeeze her hand very hard and that there's a reason why the child might not be happy with Motel 6

without there having been any domestic violence on the part of the defendant on that occasion.

More importantly, the court believes it is in the best interests of the children that they continue with the person who has been primarily raising them.

The court ended its ruling by addressing defendant:

As far as involving the children in the disputes, sir, if you involve these children in further disputes, and the court believes that you probably did tell [them] that there was a restraining order that prevented you from going there. The court believes that and the court believes that you—that this—that may not have been the only thing that you said, but if you involve them further in these disputes, not only do you jeopardize your parent of primary residence status with these children, or perhaps your visitation with these children, but you also jeopardize your children.

With that proviso, the court entered the final restraining order against defendant, and further ordered him to participate in anger management training and a batterers' intervention program.

On appeal, plaintiff argues that the trial court erred in granting defendant exclusive possession of the marital home and in granting defendant temporary custody of the couple's two children. We agree.

We begin our discussion by underscoring that our review of a trial court's factual findings is limited. *Cesare v. Cesare*, 154 *N.J.* 394, 411, 713 *A*.2d 390 (1998). Findings by the trial court "are binding on appeal when supported by adequate, substantial, credible evidence." *Id.* at 412, 713 *A*.2d 390 (citing *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A*.2d 495 (1974)). We further accord deference to family court factfinding because of the "family courts' special jurisdiction and expertise in family matters." *Id.* at 413, 713 *A*.2d 390. Deference is especially appropriate in a case, such as this one, in which the evidence is largely testimonial and involves questions of credibility, because the trial court's ability to see and hear the witnesses provides it a better perspective than a reviewing court to judge their veracity. *Id.* at 412, 713 *A*.2d 390.

Our scope of review is expanded, however, where the focus of the dispute is on "the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom."

*N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007) (quotation omitted). "Still, even in those circumstances we will accord deference unless the trial court's findings went so wide of the mark that a mistake must have been made." *Ibid.* (quotation omitted). We do not, however, accord special deference to the trial court's interpretation of "the legal consequences that flow from established facts." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

██ The trial court's findings, set forth in the beginning of this opinion regarding the events over the course of the seven months following defendant's discovery of his wife's extra-marital affair, are supported by substantial credible evidence in the record and we do not disturb them. The facts as found, however, do not overcome the presumption embodied in *N.J.S.A.* 2C:25–29b(11), governing the court's award of temporary custody in a proceeding under the Prevention of Domestic Violence Act (PDVA), *N.J.S.A.* 2C:25–17 to –35, "that the best interests of the child are served by an award of custody to the non-abusive parent." Moreover, these facts cannot support an order granting exclusive possession of the marital home to the party the court has found to have perpetrated the abuse.

██ The Legislature enacted the PDVA in response to the serious societal problem of domestic violence, which persists "as a grave threat to the family, particularly to women and children." *State v. Chenique–Puey,* 145 *N.J.* 334, 340, 678 *A.*2d 694 (1996). In crafting the law, the Legislature made clear its intention " 'to assure the victims of domestic violence the *maximum protection* from abuse the law can provide.' " *Cesare, supra,* 154 *N.J.* at 399, 713 *A.*2d 390 (quoting *N.J.S.A.* 2C:25–18). Our Supreme Court has likewise made clear its belief "that there is no such thing as an act of domestic violence that is not serious." *Brennan v. Orban,* 145 *N.J.* 282, 298, 678 *A.*2d 667 (1996).

In enacting the statute, the Legislature determined that there exists "a positive correlation between spousal abuse and child

abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence." *N.J.S.A.* 2C:25–18. This legislative declaration guides our interpretation of the statute generally, and specifically limns our understanding of the statute's presumption that temporary custody is to be awarded to the non-abusive parent.

Here, the only finding relied upon by the trial court in determining that the presumption had been rebutted was that defendant had become the children's primary caretaker following his illness and his wife's return to work.[1] We think this finding, standing alone, entirely insufficient to rebut the presumption that the children's best interests are served by an award of custody to the non-abusive parent in light of the Legislature's express declaration that children exposed to domestic violence "suffer deep and lasting emotional effects" from the experience. *N.J.S.A.* 2C:25–18; *cf. Mann v. Mann*, 270 *N.J.Super.* 269, 273–74, 637 *A.2d* 170 (App.Div.1993) (affirming temporary custody of parties' three children to father following entry of domestic violence final restraining order against mother not employed outside the home).

The temporary custody award is further inappropriate in light of the trial judge's other findings. The court found a predicate act and three separate prior acts of domestic violence committed against the children's mother, all of which involved a physical touching. The acts all occurred over the span of seven months, all were in the home, and three of them occurred in front of the children. The first time defendant put his hands around his wife's throat and choked her, the couple's eight-year-old son was so alarmed and frightened that he called the police for help.

---

[1] We note that both children attended school on a full-time basis at the time of these events. We also note that the custody arrangement the parties had negotiated during their brief separation would be characterized as a shared-parenting arrangement for child support purposes.

We do not doubt that the trial judge correctly found that "defendant's anger issues are anger issues about one thing only," that being his wife's infidelity. But we think the judge erred and misperceived the nature and effect of domestic violence in a family when he apparently determined that the level of anger defendant harbored for his wife was isolated and thus did not affect the couple's children. Defendant's anger over the weeks and months following the disclosure, when he burned her clothes and other possessions, did not subside. Indeed, just the opposite occurred. His attacks on his wife became more frequent and escalated in intensity. The court also clearly credited the testimony that defendant had spoken to the children about the temporary re-straining order and that the children, by their comments, dis-played an inappropriate awareness of the problems between their parents. Defendant's anger was clearly a force beyond his mas-tery or control. These facts found by the trial judge, and sup-ported by substantial credible evidence in the record, make clear that the statutory presumption, grounded in the Legislature's judgment that children exposed to domestic violence are detrimen-tally affected by the experience, was not rebutted here and that the award of custody to defendant was error. *Manalapan Realty, L.P., supra,* 140 *N.J.* at 378, 658 *A.*2d 1230 (no deference owed to trial court's legal conclusion flowing from established facts).

■■■ Upon a finding of domestic violence, the PDVA makes available expansive remedies "designed for the protection and safety of the victim." *Finamore v. Aronson,* 382 *N.J.Super.* 514, 519, 889 *A.*2d 1114 (App.Div.2006) (citing *N.J.S.A.* 2C:25–29). "The broad range of relief available to a trial court is designed to effectuate the remedial nature of the Act, which is to be liberally construed to achieve its salutary purposes." *Id.* at 519–20, 889 *A.*2d 1114 (citing *Cesare, supra,* 154 *N.J.* at 400, 713 *A.*2d 390). Among the specific remedies included in the Act is:

An order granting exclusive possession to the plaintiff of the residence or house-hold regardless of whether the residence or household is jointly or solely owned by the parties or jointly or solely leased by the parties. This order shall not in any manner affect title or interest to any real property held by either party or both

jointly. If it is not possible for the victim to remain in the residence, the court may order the defendant to pay the victim's rent at a residence other than the one previously shared by the parties if the defendant is found to have a duty to support the victim and the victim requires alternative housing.

[*N.J.S.A.* 2C:25–29(b)(2).]

■ Here, the trial court granted exclusive possession of the marital residence to the abuser under circumstances in which there was no impediment to his wife remaining in their home. There is no statutory authorization for such relief. We have held in a domestic violence case that

the trial court possesses the statutory authority as well as the inherent power to direct any party in the matter to take action that reasonably serves the purposes of the Act or the court's own jurisdictional needs, or to refrain from conduct that has the capacity to frustrate the legislative design or the court's authority.

[*P.J.G. v. P.S.S.,* 297 *N.J.Super.* 468, 472, 688 A.2d 630 (App.Div.1997).]

That power is not without its limits. Indeed, we went on to say in that case, that if such an order is "directed against a party not found to have violated the provisions of the Act, [it] must be narrowly framed with the purposes of the Act in mind." *Ibid.* *P.J.G.* provides no support for the trial court's order granting defendant exclusive possession of the marital residence. We cannot find, on these facts, that the trial court's order was framed in accordance with the purposes of the Act. The order, in this instance, turned the Act on its head, denying the victim of domestic violence temporary custody of her children and leaving her abuser in exclusive possession of their home.

We need not reach on this record the issue of whether plaintiff's proposed resolution of the issue of possession of the marital home, that defendant could come to the house at 6:30 a.m., when she left for work, to get the children off to school and be there until she returned home at 4:30 p.m., violated the PDVA's prohibition against in-house restraining orders. *N.J.S.A.* 2C:25–28.1. We are satisfied that the trial judge was correct in finding that, even if such arrangement did not violate the statute, the couple's history of domestic violence made such an arrangement unwise.

Finally, we are acutely aware of the passage of time since the order under review was entered. We are also mindful that

plaintiff moved for reconsideration of this order before the trial court, and, unsuccessfully, sought emergent relief and acceleration of the appeal. For the reasons expressed, we hold that the trial court order granting defendant temporary custody of the children and exclusive possession of the marital home must be reversed. Because these issues are now bound up in the pending divorce action,[2] we sua sponte order the domestic violence proceeding consolidated with the divorce action pursuant to *Rule* 4:38–1. *Mann, supra*, 270 *N.J.Super.* at 273–74, 637 *A.*2d 170 (in appropriate cases, domestic violence action may be consolidated with any other cognate Family Part matter). We direct the trial court to immediately reconsider the now-existing temporary custody arrangements in light of this opinion. *Cf. Grover v. Terlaje,* 379 *N.J.Super.* 400, 410, 879 *A.*2d 138 (App.Div.2005) (discussing factors court is to consider in determining post judgment award of physical and legal custody in light of presumption that child's best interests are served by an award of custody to the non-abusive parent). We likewise order the immediate reconsideration of the provision of the Final Restraining Order granting exclusive possession of the marital home to defendant.

Reversed and remanded for further proceedings in conformance with this opinion. We do not retain jurisdiction.

---

[2] In response to our inquiry, we have been advised that the divorce action, instituted before the order under review was entered, is still pending in the Family Part.