**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2771-14T2

S.G.,

    Plaintiff-Respondent,

v.

A.G.,

    Defendant-Appellant.

_____

Argued May 2, 2017 — Decided May 30, 2017

Before Judges Koblitz and Sumners.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Hudson County,
Docket No. FV-09-2735-14.

Michael T. Willis argued the cause for
appellant.

Emily J. Rodriguez argued the cause for
respondent (Bressler, Amery & Ross, attorneys;
Katherine E. Suell, on the brief).

PER CURIAM

    Defendant A.G. appeals, after a four-day trial, from a January

7, 2015 final restraining order (FRO) based on his wife's

allegations of assault and harassment.  Defendant argues that the judge: did not perform his analysis concerning the need for an FRO thoroughly; improperly considered defendant's violations of the temporary restraining order (TRO); improperly considered defendant's learning disability as a reason plaintiff required protection; and made findings inconsistent with the record.  We disagree and affirm.

The parties had been married for fifteen years at the time of trial.  They have nine-year-old fraternal twins.  Plaintiff S.G. alleged that during an argument on June 18, 2014, defendant grabbed plaintiff's left arm and started punching her forearm and then her upper arm "even harder."  Plaintiff stated that defendant told her he was going to kill her in a "mean I-am-going-to-kill-you voice."  She said she was able to pull her arm away from him and then run down the steps yelling for her children to "get out."  Defendant acknowledged that they had an argument, but claimed the he did not "lay hands" on plaintiff or threaten to kill her.

Bayonne Police Officer Martin Gil and another officer responded to plaintiff's 911 call.  Plaintiff waited outside for the police to respond.  She testified that she told the two responding officers that defendant hit her, but showed them only her forearm and not her upper arm.  Officer Gil stated that plaintiff did not show him any injury.  Officer Gil remembered

that the woman he spoke to was "a little concerned maybe for her safety."

Later that day, plaintiff went to the police station to obtain a TRO alleging assault, harassment and terroristic threats; pictures were taken of her arm. Although served with the TRO restraining his contact with plaintiff, defendant continued to contact plaintiff by text message, phone and email. Defendant claimed his dyslexia prevented him from reading or understanding the contents of the TRO.

At trial, plaintiff presented photographs of her arm after the incident. Some were taken by a staff member of the Domestic Violence unit the day of the incident and others were taken five days after the events by a co-worker. The photographs of her under-arms showed scratch marks from defendant's nails. Defendant responded that he noticed the bruise on plaintiff's arm a week prior to the argument; he claimed she received the bruise at work. Plaintiff testified she obtained a TRO because she was "scared." She said she wanted an FRO because she did not feel safe with defendant. She testified that he had erratic mood swings and was severely depressed.

Plaintiff also testified to three prior incidents of domestic violence that were related in all versions of her TRO. Defendant denied any violence alleged in the three prior incidents.

Plaintiff first testified to an incident years earlier, in June 2010, when she called the police. Plaintiff stated that during this time period the young children were regularly sleeping in their parents' bed. On this night, their daughter had fallen asleep in the parties' bed and defendant at some point took her into her own room and put her in the crib.

When plaintiff walked into the twins' room she saw defendant holding down their daughter in the crib as the child cried and struggled to get up. Defendant then ran downstairs and at first refused to let plaintiff past the safety gates. After this, he started repeating that the kids should be in their bed and that he was told by a nurse they should not be in their parents' bed. Plaintiff testified the defendant's tone was scaring her and so she called the police.

In the second incident, plaintiff testified that in March 2011 she and defendant were arguing near the doorway of their house about whether defendant could take the car and drive to his friend's house to buy marijuana when he punched her two or three times in her temple.

Finally, plaintiff recounted a nighttime incident in 2012 when defendant mistreated the children. Plaintiff testified that she threw a glass of water at defendant. Defendant then picked up a laundry basket and started hitting her on the right side of

her head, near her temple area. She stated she kept reaching out and finally grabbed defendant's glasses. After this, they both stopped and plaintiff gave defendant his glasses back.

Plaintiff also testified to defendant's continued contact with her after the initial TRO was issued. Defendant sent plaintiff around twenty-three text messages. Two of these messages contained photographic attachments of defendant. One of the text messages threatened to cancel plaintiff's cell phone, and indeed it was turned off around that time. Defendant admitted that he took plaintiff off the cell phone plan, but indicated it was just a mistake and not intentional. Defendant admitted that he sent plaintiff text messages after the first TRO "to save the marriage."

Defendant also called plaintiff twenty-four times. Several of defendant's voice messages were played for the court; plaintiff identified the calls as coming from defendant's number and stated she recognized defendant's voice. Plaintiff also testified to five e-mails received after the TRO, which contained articles or information about love, marriage and Judaism. Defendant admitted sending the emails.

During cross-examination, defendant read part of the July 10 amended TRO into the record which prohibited him "from having any oral, written, personal, electronic, or other form of contact or communication with plaintiff." He admitted that after the June

5

incident he was aware he was not allowed to return to the marital home. He also admitted that by July 19 — the time of one of the voice messages — he knew he was not supposed to call plaintiff. Plaintiff testified that she did not respond to any of defendant's messages and she was "upset" that he was contacting her.

Plaintiff and defendant both testified that defendant had a learning disability. Defendant testified that since his mid-forties he had been prescribed medication for ADHD, but stopped taking it because it was "giving [him] symptoms of a heart attack." Defendant further testified that having dyslexia affected his "[s]pelling, memory, reading, comprehending, . . . paying attention, being able to read a book through and then remembering what I read." Defendant testified four different times that people who have ADHD often act before they think.

The judge began his oral decision by noting that he decided the case based on the credibility of the parties. He stated:

> And credibility isn't some magical determination. A lot of it is sort of common sense, a lot of it is assessing people's demeanor in court and seeing how they testify, the manner in which they testify, the types of answers they give to questions, whether those answers make sense, whether they seem to comport with what might be normal behavior or assessments of certain situations. And that's essentially, again, what I'm indicating the case comes down to.

The judge found plaintiff to be "very measured throughout this trial." On the other hand, the judge found defendant to be "a little more evasive at times . . . [and] not as forthcoming as [plaintiff]." The trial judge found by a preponderance of the evidence that defendant committed harassment and assault on June 18.

With regard to the terrorist threats allegation, the judge found that defendant's statements did not meet the required legal standard, but the judge went on to find that defendant's verbal threat was included in the harassment charge as it would cause plaintiff to be fearful or annoyed. The judge also found by a preponderance of the evidence that defendant had committed the act of assault.

The judge noted that he did not consider the potential violations of the restraining order as a predicate act of harassment. He stated that:

> the record should bear out — I am not and have not considered the "subsequent acts" of potential violations of the restraining order, things of that nature, as it relates to whether or not those are acts of harassment. I am basing my decision, as I've indicated and the record will bear out, on the allegation in question from June 18th.

The judge did, however, consider the subsequent acts in his consideration of whether a restraining order was necessary to protect plaintiff from further harassment. The judge stated,

"it's difficult to say that there's no need for a final restraining order when . . . from the Court's perspective [defendant] . . . has shown that he doesn't abide by the terms of the order."

For a court to find that an FRO under the Prevention of Domestic Violence Act (Act) is warranted, it must find initially that the plaintiff established by a preponderance of the evidence that the defendant committed one of the offenses enumerated in N.J.S.A. 2C:25-19(a) as an act of domestic violence. Franklin v. Sloskey, 385 N.J. Super. 534, 542 (App. Div. 2006). "If the court finds a defendant committed one or more of the predicate acts listed in N.J.S.A. 2C:25-19(a), the judge must determine whether an FRO is needed to protect the victim." A.M.C. v. P.B., 447 N.J. Super. 402, 413 (App. Div. 2016).

Harassment, N.J.S.A. 2C:25-19(a)(13), is committed when a person, with purpose to harass:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or in any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A person is guilty of assault, N.J.S.A. 2C:25-19(a)(1), when he or she "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another." A.M.C., supra, 447 N.J. Super. at 410.

In domestic violence cases, "review of a trial court's factual findings is limited." J.D. v. M.A.D., 429 N.J. Super. 34, 42 (App. Div. 2012). Family Part judges "have been specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples." J.D. v. M.D.F., 207 N.J. 458, 482 (2011). "[W]e grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015) (quoting D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013), certif. denied, 216 N.J. 587 (2014)).

Defendant argues that even if the judge found plaintiff more credible, an FRO was not necessary for her protection. We recently held that

> [w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO "is most often perfunctory and self-evident." But even when the predicate act does not involve physical violence, the trial court must still evaluate the factors in N.J.S.A. 2C:25-29(a)(1) to -(6) to determine whether an FRO is warranted to protect the victim from an immediate danger or to prevent further abuse.

> A.M.C., supra, N.J. Super. at 417 (internal citations omitted) (quoting Silver v. Silver, 387 N.J. Super. 112, 127 (2006)).

The judge evaluated the necessity of future protection using defendant's violation of the TRO as one indication. In evaluating prong two of Silver, the central inquiry is "whether a domestic violence restraining order is necessary to protect plaintiff from immediate danger or further acts of domestic violence." Silver, supra, 387 N.J. Super. at 128. To make this determination, a court should consider "[t]he nonexclusive statutory factors includ[ing] the 'previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse,' the 'existence of immediate danger to person or property,' and the 'best interests of the victim and any child.'" N.T.B., supra, 442 N.J. Super. at 223 (quoting N.J.S.A. 2C:25-29(a)(1)-(2), (4)) (emphasis added).

Simple assault under N.J.S.A. 2C:12-1(a)(1) does not require that the bodily injury be "serious". Contrary to defendant's argument, the fact that plaintiff was not seriously injured does not demonstrate that an FRO was not necessary for her protection.

At trial, defendant contended that by considering violations of the TRO, which could have been charged as criminal offenses, N.J.S.A. 2C:29-9(b), the court was improperly according him fewer protections than he would have received if the violations were

heard in a criminal setting. Defendant continues that novel argument on appeal, asserting that, because the criminal violation of a restraining order requires the State to meet the "beyond a reasonable doubt" legal standard, higher than the civil "preponderance of the evidence" standard, that the judge's decision to consider the post-TRO behavior in the <u>Silver</u> analysis was incorrect.

Amendments of a TRO provide notice to defendants of allegations to be proven at trial. <u>See</u> <u>M.D.F.</u>, <u>supra</u>, 207 <u>N.J.</u> at 479-80; <u>J.F. v. B.K.</u>, 308 <u>N.J. Super.</u> 387, 391-92 (App. Div. 1998). As to whether post-TRO violations can be added as a predicate act, the statute <u>N.J.S.A.</u> 2C:25-19(a)(17), effective after this trial, allows it. The judge, however, did not use post-TRO activity as a predicate act in this pre-amendment trial, but rather, appropriately, used the TRO violations as evidence that plaintiff needed an FRO to protect her against defendant's harassment.

Defendant also argues that the court improperly considered his own testimony that he has ADHD. Defendant argues that trial judge drew from this testimony, which was not supported by any expert diagnosis, that defendant has violent tendencies due to his condition. Defendant testified four times at trial that individuals with ADHD sometimes act without thinking. In doing

11

so, defendant was attempting to provide an explanation for his non-responsive answers and poor memory. Defendant was also using this argument, along with his diagnosis of dyslexia, to explain why he did not initially adhere to the TRO.

The judge did mention defendant's diagnoses as support for his determination that defendant might act before thinking, thus presenting a danger to plaintiff. While this inference in a different case would be troubling, defendant's trial presentation amounted to invited error. "The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)). "A party who consents to, acquiesces in, or encourages an error cannot use that error as the basis for an objection on appeal." Spedick v. Murphy, 266 N.J. Super. 573, 593, (App. Div.), certif. denied, 134 N.J. 567 (1993).

Defendant advanced an interpretation of his learning disabilities for his own strategic purpose. He cannot, therefore, now challenge the validity of judge's findings based on a lack of expert testimony, when he himself conceded to and advanced that position.

Defendant's attacks on the judge's credibility assessments are without sufficient merit to require discussion in a written opinion. R. 2:11-3(e)(1)(E). We defer to the trial judge's assessment of credibility, especially when, as here, those determinations are supported by reference to the record. M.A.D., supra, 429 N.J. Super. at 42.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION