RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5618-14T3

H.C.F.,

 Plaintiff-Respondent,

v.

J.T.B.,

 Defendant-Appellant.

_________________________________________

 Argued November 2, 2016 – Decided September 7, 2017

 Before Judges Fuentes, Carroll and Gooden
 Brown.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part, Morris
 County, Docket No. FV-14-1099-15.

 Jill Anne LaZare argued the cause for
 appellant (Law Offices of Jill Anne LaZare,
 LLC, attorney; Ms. LaZare, on the briefs).

 Sarah J. Jacobs argued the cause for
 respondent (Jacobs Berger, LLC, attorneys; Amy
 L. Bernstein, on the brief).

PER CURIAM

 Defendant (husband) appeals from a July 1, 2015 final

restraining order (FRO) entered against him in favor of plaintiff
(wife) pursuant to the Prevention of Domestic Violence Act (PDVA),

N.J.S.A. 2C:25-17 to -35. We affirm.

 We summarize the relevant facts. Plaintiff, then forty-

years-old, and defendant had known each other since high school

and married in 2008. Their daughter was born in 2011 and all

three resided in a two-story three-bedroom house in Chatham.

Although plaintiff paid the mortgage on the home, both parties'

names were on the mortgage and the deed. Plaintiff had a degree

in finance from Georgetown University and a MBA from UC Davis and

worked full-time for the Nielsen Company, while defendant worked

part-time for the YMCA and served as a stay-at-home parent.

 On June 24, 2015, plaintiff filed a complaint against

defendant seeking injunctive relief under the PDVA alleging that

defendant committed acts of domestic violence, specifically

criminal mischief and harassment. In her complaint, plaintiff

alleged that at 10:30 a.m. on June 24, 2015, defendant "punched a

door with a closed fist causing the door to come off the hinges"

after the parties "were involved in an argument" and defendant

became angry. The complaint also alleged that defendant possessed

a firearm and had "communicated via text in February of 2015 that

he would end his life to stop plaintiff's suffering." According

to the complaint, there was no prior history of domestic violence.

 2 A-5618-14T3
 The Family Part judge conducted an evidentiary hearing on

July 1, 2015, during which both parties were represented by

counsel. At the hearing, plaintiff testified that for the past

two-and-a-half years, plaintiff and defendant had been sleeping

in separate bedrooms in their Chatham home. According to

plaintiff, on the morning of June 24, 2015, while washing up in

the upstairs bathroom, she "noticed that . . . [her] whole neck

was red and swollen[.]" Plaintiff asked defendant "to come

upstairs and to look at [her] neck." Plaintiff waited for

defendant in her bedroom; their daughter was in plaintiff's bedroom

watching television on the bed.

 When defendant came upstairs, plaintiff asked defendant

whether he could "see if there's like a bug bite or anything

here[.]" Without looking at plaintiff, defendant stated, "your

neck is not red. You're fine." Plaintiff retorted "thanks for

caring[.]" As defendant went to get their daughter from the bed,

he responded "you're such a fucking bitch[.]" In reply, plaintiff

asked "this is what you say to me?" At that point, plaintiff

testified defendant exhibited "this rage" that "struck a lot of

fear in [her]." Defendant then stated, "why do you say these

things" and "turned around" and punched her bedroom door.

 According to plaintiff, defendant struck the door, which she

described as a "big solid wood door[,]" in its "[u]pper right-hand

 3 A-5618-14T3
corner" with his right hand, cracking its paint and dislodging a

screw. Plaintiff testified that when defendant punched the door,

he was standing about "an arm's length" from her and punched the

door with such force that "the door came off . . . both hinges"

and "fell against . . . a wall" behind the door inside the bedroom.

According to plaintiff, the door ended up approximately "three-

and-a-half feet" from the bed where their daughter remained

throughout the incident.

 Plaintiff testified that after witnessing the incident, their

daughter asked defendant why he hit the door and why he had "a

boo-boo on his hand[.]" The child's question caused defendant to

leave the bedroom and run downstairs. Plaintiff believed defendant

"was going to leave because, usually, he just leaves[] [when] we

have any disagreement[.]" However, instead of leaving, defendant

asked her to come downstairs. Plaintiff thought, "this is it, he

went and got the gun," referring to a gun defendant had acquired

when the couple lived in Arizona. Although she was afraid for

herself and her daughter, she left her daughter on the bed in her

bedroom where she believed she was safe and went downstairs to

"face" defendant.

 When plaintiff went downstairs, she and defendant discussed

their failing marriage. Plaintiff indicated that she could leave

and take their daughter, to which defendant replied "you're not

 4 A-5618-14T3
taking [our daughter] anywhere[.]" At that point, defendant went

back upstairs and plaintiff followed while continuing their

discussion about their marital discord. Defendant tried "to get

[their daughter] dressed, but she was agitated" and repeatedly

told defendant to "stop trying to trick mommy[.]" According to

plaintiff, defendant eventually looked at their daughter "with

this rage and this anger that [she had] never seen him have before"

and eventually abandoned his efforts to dress her.

 After defendant went downstairs, plaintiff dressed her

daughter and took her with her to the doctor to have her

(plaintiff's) neck examined. Thereafter, she left her daughter

at home with defendant to take a nap and then drove to the police

station to file a domestic violence complaint and obtain a

temporary restraining order. Plaintiff explained she did not take

her daughter with her to the police station because of her young

age and she did not call the babysitter because "she's only

available at nighttime." Plaintiff testified that she went to the

police because she "was scared." According to plaintiff, she was

"scared every night when [she] go[es] to bed that [defendant]'s

going to shoot [her]." Plaintiff stated that defendant did not

have a permit for the gun but kept it in the house and refused to

tell her its location. Plaintiff also testified about another

incident that occurred in February of 2015 when defendant sent her

 5 A-5618-14T3
a text that plaintiff interpreted as a threat that he would use

the gun to kill himself.

 According to plaintiff, the text stemmed from an argument

that occurred after plaintiff witnessed "a major car accident"

while driving alone to the doctor for a biopsy. Horrified by the

accident, apprehensive about the biopsy, and exasperated by

defendant's lack of support, plaintiff communicated via text to

defendant her "unhappiness with the marriage, . . . his lack of

empathy and his callousness." Defendant responded in a text

stating "[d]on't worry. One of these days, I'm going to end my

life and your suffering." Concerned for her daughter's safety,

plaintiff queried, "is this . . . something you are going to do

when you are with her? Do I need to put her in daycare? Is she

not safe at home with you?" Defendant responded, "she's safe. I

wouldn't do it with her around." Although plaintiff did not

discuss the threat with defendant again, she contacted their

marriage counselor for help and forwarded the text messages to the

counselor who suggested taking defendant to the hospital. During

the weeks that followed, plaintiff also met with a divorce

attorney.

 According to plaintiff, although she was "scared every day

when [she left] the house[,]" and she "knew that the marriage was

over[,]" she remained in the marital residence with defendant

 6 A-5618-14T3
until the June 24, 2015 incident. Plaintiff explained that she

did not act before the incident because she was "paralyzed in

fear" and because she was "the bread winner." Plaintiff testified

that she "had to pay . . . bills and take care of the house" and

she "was afraid . . . he might hurt himself . . . [or] hurt the

baby." According to plaintiff, to protect her daughter, she

"started coming home early[,] . . . working from home on odd days[,

and] canceled business trips." She also started checking her

daughter for injuries on a regular basis. Upon being cross-

examined about a photo of defendant and their daughter that she

had posted on Facebook on June 21, 2015, with the message "Happy

Father's Day to the most loving and attentive dad I know[,] [w]e

love you[,]" plaintiff explained that she was "trying to make

something more positive, so he maybe won't be so horrible."

 During his testimony, defendant admitted punching the door

as he was exiting plaintiff's bedroom. According to defendant,

after he looked at plaintiff's neck as she requested, he told her

that he "[didn't] see anything." Plaintiff responded by becoming

"extremely upset" and told defendant he did not "love her" and was

not "empathetic towards her." Defendant testified that plaintiff

"started getting loud" and using "curse words" while their

"daughter was on the bed" notwithstanding the fact that he had

repeatedly told plaintiff "not to yell at [him] and use curse

 7 A-5618-14T3
words in front of [their] daughter." Defendant acknowledged that

it was the "last straw[.]" However, defendant explained that

plaintiff "was on the complete opposite corner of the room" when

he punched the door. He denied punching the door to annoy or

scare plaintiff but testified that he acted out of frustration and

regretted the fact that his daughter witnessed the incident.

 According to defendant, because the "top hinges came loose"

and "[t]he screws started to pull from the door jam," he "removed

the door completely and laid it up against the wall." He denied

throwing the door against the wall and denied that the door would

have fallen on his daughter. He claimed that his punch loosened

the hinges and screws because he had failed to properly reinstall

the door after removing it to paint plaintiff's bedroom. Defendant

acknowledged that "[he] was upset" and when he asked plaintiff to

come downstairs, his tone could have been interpreted as forceful

and demanding. However, the ensuing argument was "very brief" and

they were "calm" and civil. Defendant testified he was accustomed

to their daughter insisting on being dressed by plaintiff because

she does not spend as much time with their daughter as he does.

Consequently, he went into the spare bedroom downstairs while

plaintiff dressed her before leaving for the doctor.

 Defendant confirmed that plaintiff brought their daughter

home for a nap before leaving again and testified that he was

 8 A-5618-14T3
eating dinner when the police arrived. According to defendant,

he was surprised because plaintiff never expressed any fear of

him. He explained that the February 2015 text was his reaction

to plaintiff complaining about his lack of ambition, empathy and

love and was written in "a joking manner." He denied threatening

to shoot himself or anyone else. Defendant also confirmed that

plaintiff asked him to move the gun from its original location in

the spare bedroom. However, he testified that he told plaintiff

that he had moved the gun to the basement. He explained further

that although "the gun [was] always loaded[,]" the "decocker,

which is a safety . . . was on" and "[the gun] was kept in a case."

He also testified that they had participated in firearms training

together in Arizona.

 Defendant called as a witness the grandmother of a little boy

who had attended classes and had had play dates with his daughter.

She testified that in the two years she had known defendant, she

had never seen him angry. She also testified that defendant and

his daughter were "very close" and had a "great relationship" and

she did not believe defendant posed a danger to his child.

 In an oral opinion rendered immediately after the hearing,

the judge found that the entry of a FRO was justified. The judge

noted that the case boiled down "to credibility" and found

plaintiff's version more credible, concluding that "it's more

 9 A-5618-14T3
probable that this incident occurred the way the plaintiff says[.]"

Applying the first prong of the two-prong Silver1 analysis, the

court determined that plaintiff established by a preponderance of

the evidence that defendant committed the predicate acts of

criminal mischief and harassment by striking her bedroom door

while "engaged in an argument" with plaintiff with enough force

to knock it off its hinges and "damage[] the door[.]"

 Regarding criminal mischief, the court noted initially that

although both parties owned the house, "it does not give

[defendant] the right to damage property in the house because the

plaintiff and defendant each own an undivided interest." The

court continued:

 Defendant claims that the door was weak and
 needed repair, but the fact is the door is off
 the hinges.2 There is a crack on the door
 . . . and, certainly, it appears, at least to
 this [c]ourt, that the door was damaged with
 sufficient force . . . it was taken off the
 hinges.

 Clearly, the defendant knew he was doing
 it and it appears that there's really no
 . . . issue that the door was damaged and
 taken off the hinges. It [sic] pulled out of
 the holes. Defendant even admitted to that
 and hitting it. That alone is a predicate act
 of domestic violence, criminal mischief.

1
 Silver v. Silver, 387 N.J. Super. 112 (2006).
2
 The court was referring to photographs depicting the damaged
door that were admitted into evidence.

 10 A-5618-14T3
 As to harassment, the court reasoned:

 Harassment becomes a little more
 contentious and really boils down to
 credibility . . . .

 Clearly, the parties had an argument, a
 disagreement. He made a comment to her and,
 . . . I have to look at the response. What
 other reason do you hit a door? Why do you
 hit a door? . . . [W]hat's a legitimate reason
 for hitting a door, other than to . . . annoy
 or to alarm the other party. I can't really
 see . . . any other decision. I have to
 believe the plaintiff, that the door was
 damaged in an argument and looking at the door
 knocked off the hinges, . . . it's inescapable
 to me that he damaged the door with intent to
 harass her, to certainly alarm her. I think
 it's certainly alarming when somebody knocks
 a door off the hinges.

 The court determined further that entry of the FRO was

necessary under the second Silver prong to protect plaintiff and

prevent further abuse. In that regard, the court observed:

 And in February, this defendant made comments
 about ending his life and then didn't just end
 with that. The response that the plaintiff
 made was, why would you threaten me with that?
 He doesn't respond, I'm just kidding, you know
 I would never do that. His response is, she's
 safe, which means his daughter. I wouldn't
 do it with her around. He doesn't deny it.

 That statement is very, very troubling
 and combined with the damage to the door, it
 really leads me to the conclusion that there
 is a potential. They're in the middle of a
 divorce, and I understand that . . . I have
 to be careful of one party . . . taking
 advantage of another party. But in this case,
 . . . it's kind of a different situation. The

 11 A-5618-14T3
 plaintiff has the financial wherewithal. She
 could leave. She could move to another house,
 if she wanted to. So I don't see that she's
 trying to take advantage of the defendant. I
 don't see that as being a legitimate argument.

 . . . .

 And then based on his past and the fact
 that there is a gun in the house and the
 comments that he made lead this [c]ourt to the
 conclusion that the statutory requirements are
 that I take every effort to protect victims
 and, in this case, I think that, based on the
 comments that he made, there's a likelihood
 it might occur and I have to prevent that and,
 on that basis, I am going to grant the
 restraining order.

The court also granted plaintiff temporary custody of their

daughter and exclusive possession of the marital home, but allowed

defendant liberal visitation at plaintiff's discretion after

determining that defendant did not pose a danger to their daughter.

 This appeal followed. On appeal, defendant argues that the

evidence was insufficient to sustain a violation under the PDVA.

Specifically, defendant argues that plaintiff "failed to meet her

burden of proof" and the court erred in its analysis under Silver.

Defendant also argues that the court erred in awarding plaintiff

temporary custody of their daughter given the fact that defendant

has been the child's primary caregiver.

 Factual findings of the trial court should not be disturbed

unless they "are so manifestly unsupported by or inconsistent with

 12 A-5618-14T3
the competent, relevant and reasonably credible evidence as to

offend the interests of justice." Cesare v. Cesare, 154 N.J. 394,

412 (1998) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co.,

65 N.J. 474, 484 (1974)). "Deference to the trial court's factual

findings is especially appropriate when the evidence is largely

testimonial and involves questions of credibility[,]" In re Return

of Weapons to J.W.D., 149 N.J. 108, 117 (1997), and "[b]ecause of

the family courts' special jurisdiction and expertise in family

matters[.]" Cesare, supra, 154 N.J. at 413. Reversal is warranted

only "if the court ignores applicable standards[.]" Gotlib v.

Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008).

 The PDVA provides that a FRO may be issued if the court

determines "by a preponderance of the evidence[,]" N.J.S.A. 2C:25-

29(a)(1), that the defendant has committed an act of domestic

violence "upon a person protected under" the PDVA. N.J.S.A. 2C:25-

19(a). A person protected under the PDVA includes "any person who

is 18 years of age or older . . . and who has been subjected to

domestic violence by a spouse" or "any person, regardless of age,

who has been subjected to domestic violence by a person with whom

the victim has a child in common[.]" N.J.S.A. 2C:25-19(d). The

term "domestic violence" is defined in N.J.S.A. 2C:25-19(a) to

mean "the occurrence of one or more" specified acts, known as

 13 A-5618-14T3
predicate acts, including criminal mischief and harassment.

N.J.S.A. 2C-19(a)(13).

 A person commits criminal mischief if he "[p]urposely or

knowingly damages tangible property of another[.]" N.J.S.A.

2C:17-3(a). N.J.S.A. 2C:17-3(a) does not define what constitutes

"property of another," but we have interpreted the term to include

"damage to a [spouse's] undivided interest in the home as a tenant

by the entirety[.]" N.T.B. v. D.D.B., 442 N.J. Super. 205, 220

(App. Div. 2015). Thus, in N.T.B., we held that "in breaking down

[a spouse's] bedroom door, [the other spouse] . . . destroy[ed]

property of another and therefore committed the predicate act of

criminal mischief." Id. at 219.

 A person commits harassment "if, with purpose to harass

another," he "[e]ngages in any . . . course of alarming conduct

. . . with purpose to alarm or seriously annoy such other person."

N.J.S.A. 2C:33-4(c). Harassment requires that the defendant act

with the purpose of harassing the victim and judges must be mindful

that "a party may mask an intent to harass with what could

otherwise be an innocent act." J.D. v. M.D.F., 207 N.J. 458, 488

(2011). "A finding of a purpose to harass may be inferred from

the evidence presented" and a judge may use "[c]ommon sense and

experience" when determining a defendant's intent. State v.

Hoffman, 149 N.J. 564, 577 (1997). To that end, an analysis of

 14 A-5618-14T3
whether an underlying act of harassment in the context of domestic

violence has occurred requires consideration of the totality of

the circumstances. Id. at 584-85.

 Pursuant to Silver, supra, 387 N.J. Super. at 125-26, when

determining whether to grant a FRO under the PDVA, the judge must

make two determinations. Under the first Silver prong, the judge

"must determine whether the plaintiff has proven, by a

preponderance of the credible evidence, that one or more of the

predicate acts set forth in N.J.S.A. [2C:25-19(a)] has occurred."

Id. at 125.

 Although a court is not obligated to find a
 past history of abuse before determining that
 an act of domestic violence has been committed
 in a particular situation, a court must at
 least consider that factor in the course of
 its analysis. Therefore, not only may one
 sufficiently egregious action constitute
 domestic violence under the Act, even with no
 history of abuse between the parties, but a
 court may also determine that an ambiguous
 incident qualifies as prohibited conduct,
 based on a finding of [abuse] in the parties'
 past.

 [Cesare, supra, 154 N.J. at 402.]

 Under the second Silver prong, a judge must also determine

whether a restraining order is required to protect the plaintiff

from future acts or threats of violence. Silver, supra, 387 N.J.

Super. at 126-27. Although the latter determination "is most

often perfunctory and self-evident, the guiding standard is

 15 A-5618-14T3
whether a restraining order is necessary, upon an evaluation of

the factors set forth in N.J.S.A. [2C:25-29(a)(1) to -29(a)(6)],

to protect the victim from an immediate danger or to prevent

further abuse." A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App.

Div. 2016) (quoting Silver, supra, 387 N.J. Super. at 127).

 Here, we are satisfied there is sufficient credible evidence

in the record to support the judge's finding that defendant

committed the predicate acts of criminal mischief and harassment.

We are also convinced that the record supports the judge's

determination that a FRO was required to protect plaintiff and

prevent further acts of domestic violence. Defendant's argument

that the evidence was insufficient to sustain a finding of a

violation of the PDVA under Silver is belied by the record.

Moreover, we reject defendant's contention that his conduct could

more fairly be characterized as "ordinary domestic contretemps"

similar to that in Corrente v. Corrente, 281 N.J. Super. 243, 250

(App. Div. 1995), or that the allegations were merely intended to

gain an unfair advantage in the matrimonial action similar to that

in Murray v. Murray, 267 N.J. Super. 406, 410 (App. Div. 1993).3

3
 We decline to consider the unpublished opinion on which defendant
relies in his reply brief. See R. 1:36-3 (stating that "[n]o
unpublished opinion shall constitute precedent or be binding on
any court"); see also Guido v. Duane Morris LLP, 202 N.J. 79, 91
n. 4 (2010) (rejecting use of unpublished decisions as precedent).

 16 A-5618-14T3
 In addition, awarding temporary custody of their daughter to

plaintiff was entirely appropriate. After granting an FRO under

the PDVA, a trial judge "may issue an order . . . awarding temporary

custody of a minor child." N.J.S.A. 2C:25-29(b)(11). When

awarding temporary custody, the PDVA requires that the trial judge

"presume that the best interests of the child are served by an

award of custody to the non-abusive parent." Ibid. When

determining parenting time, a court "shall specify the place and

frequency of parenting time[,]" but must "protect the safety and

well-being of the plaintiff and minor children" and avoid

"compromis[ing] any other remedy provided by the court by requiring

or encouraging contact between the plaintiff and defendant."

N.J.S.A. 2C:25-29(b)(3).

 Here, the court presumed that granting plaintiff temporary

custody served the child's best interests as required under the

statute. The court also appropriately granted defendant "liberal

visitation . . . [but] at the discretion of the plaintiff." We

reject defendant's contention that his status as a stay-at-home

parent allows him to rebut the PDVA's presumption favoring a victim

of domestic abuse particularly since the child witnessed the

domestic abuse incident. An abuser cannot overcome the statutory

presumption by merely showing that he served as the child's primary

caretaker prior to the domestic abuse incident. J.D. v. M.A.D.,

 17 A-5618-14T3
429 N.J. Super. 34, 44 (App. Div. 2012). See also Mann v. Mann,

270 N.J. Super. 269, 274 (App. Div. 1993) (upholding grant of

temporary custody of parties' three children to victim where abuser

committed criminal mischief and harassment). As we noted in J.D.,

this fact, "standing alone, [is] entirely insufficient to rebut

the presumption . . . in light of the Legislature's express

declaration that children exposed to domestic violence 'suffer

deep and lasting emotional effects' from the experience." Id. at

44 (quoting N.J.S.A. 2C:25-18).

 Affirmed.

 18 A-5618-14T3