**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1810-18T4

MARYBETH JONES,

    Plaintiff-Appellant,

v.

ANDREW VIOLA, ESQUIRE,
and ALBANO VIOLA, LLC,

    Defendants-Respondents.

_____

Argued February 3, 2020 – Decided February 27, 2020

Before Judges Sabatino, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket L-4285-16.

Mark J. Molz argued the cause for appellant.

Matthew S. Marrone argued the cause for respondent (Goldberg Segalla LLP, attorneys; Matthew S. Marrone and Seth Lawrence Laver, of counsel; Andrew P. Carroll, on the brief).

PER CURIAM

Appellant[1], the custodial parent of two adult autistic children, brought this legal malpractice case against the attorney who had represented her years earlier in her divorce case against the children's father. After negotiations by that attorney, appellant entered into a settlement agreement with her husband, in which she agreed to receive alimony for only a limited duration of nine years.

Appellant claims her attorney erroneously advised her that the Family Part would extend that nine-year period, as long as she showed a continued need for the support. Finding it difficult to work and support herself because of her children's special needs, appellant tried through successor counsel to have the courts extend the nine-year alimony period, but to no avail. This malpractice lawsuit ensued.

The trial court granted the divorce attorney summary judgment dismissing plaintiff's claims against him and his law firm. Among other things, the court concluded that: the lawsuit was time-barred under the statute of limitations; appellant was estopped from bringing the malpractice case because of her stated assent to the terms of the divorce agreement; and she could not establish

---

[1] We use the term "appellant" to avoid confusion, as she was the "defendant" in the underlying divorce action and presently is the "plaintiff" in this legal malpractice case.

A-1810-18T4

proximate causation of damages. For the reasons that follow, we reverse and remand the matter for trial.

I.

Before we detail the facts and procedural history in the record, we first address the concepts of limited duration alimony and permanent alimony. These concepts are key aspects of this case and the underlying Family Part case.

By statute, the Legislature has established several categories of alimony. Two of these categories, pertinent here, are: (1) limited duration alimony, and (2) permanent alimony.[2]

Limited duration alimony ("LDA"), also known as term alimony, consists of alimony payable for a specific period of time. The Legislature has expressly authorized LDA as a permitted form of alimony, along with "rehabilitative" and "reimbursement" alimony. N.J.S.A. 2A:34-23(c)(1) to (3). The statute obligates a court to consider whether alimony is appropriate "for any or all" of those three categories. Ibid.

LDA can be appropriate in cases involving marriages of intermediate or shorter length, in which the spouse seeking support has an economic need, but

_____

[2]  In September 2014 the Legislature abolished permanent alimony by amendment to N.J.S.A. 2A:34-23(b). The parties do not dispute that the present case is governed by pre-2014 alimony law.

also possesses "the skills and education necessary to return to the workforce" at some time in the immediate future. Gordon v. Rozenwald, 380 N.J. Super. 55, 66 (App. Div. 2005) (citing Cox v. Cox, 335 N.J. Super. 465, 483 (App. Div. 2000)). LDA is designed to address a dependent spouse's post-divorce needs in situations where permanent or rehabilitative alimony is not warranted, but where economic assistance to the dependent spouse for a defined period of time is nevertheless justified. See Gnall v. Gnall, 432 N.J. Super. 129, 150-51 (App. Div. 2013), rev'd on other grounds, 222 N.J. 414 (2015); J.E.V. v. K.V., 426 N.J. Super. 475, 485-86 (App. Div. 2012).

By contrast, permanent alimony traditionally was awarded in certain situations of longer-term marriages. "The purpose of this type of alimony is to allow the dependent spouse to live the same lifestyle to which he or she grew accustomed during the marriage." Gnall, 222 N.J. at 430 (citing Crews v. Crews, 164 N.J. 11, 26 (2000)). "When awarding permanent alimony, courts have great discretion, because 'no two cases are alike.'" Ibid. (quoting Bonanno v. Bonanno, 4 N.J. 268, 273 (1950)). When fixing the annual amount of permanent alimony, courts were to evaluate the "actual needs" of the dependent spouse and the "actual means" of the payor spouse, as well as several other factors. Id. at 430-31.

"Limited duration alimony is not to be awarded in circumstances where permanent alimony is warranted." Id. at 431. "All other statutory factors being in equipoise, the duration of the marriage mark[ed] the defining instructions between whether permanent or limited duration alimony is warranted and awarded." Ibid. (quoting Cox, 335 N.J. Super. at 482).

Notably, the statutory scheme made it more difficult for an LDA recipient to obtain a court order extending the duration of the alimony period rather than the alimony amount. As the statute dictates, "[a]n award of alimony for a limited duration may be modified based either upon changed circumstances, or upon the non-occurrence of circumstances that the [trial] court found would occur at the time of the award." N.J.S.A. 2A:34-23(c); see also Lepis v. Lepis, 83 N.J. 139, 152-53 (1980) (delineating the "changed circumstances" test for modifying support). "The court may modify the amount of such an [LDA] award, but shall not modify the length of the term except in unusual circumstances." N.J.S.A. 2A:34-23(c) (emphasis added).

The statute does not define the concept of "unusual" (as opposed to merely "changed") circumstances. Our case law has recognized that the "unusual circumstances" test is a heightened standard. Gonzalez-Posse v. Ricciardulli, 410 N.J. Super. 340, 356 (App. Div. 2009). The Legislature established a

presumption that the "temporal aspect of [an LDA award] be preserved." Ibid. To overcome that presumption, a recipient seeking to extend the alimony term must demonstrate that the LDA had been originally intended to serve as "a substitute for permanent alimony premised upon a promise or expectation of alternative funds for support that has not been fulfilled or realized." Gordon v. Rozenwald, 380 N.J. Super. 55, 70 (App. Div. 2005). The Legislature adopted the heightened standard for extending the term of LDA to avoid unfairness to supporting ex-spouses, and to avoid burdening them with "regular extensions based upon comparative needs and ability to pay." Id. at 67.

## II.

With this statutory backdrop in mind, we turn to the record in this matter.

A. The 2003 Divorce and Settlement Agreement

Appellant and her spouse married in October 1985. After nearly seventeen years of marriage, the husband filed a complaint in the Family Part in August 2002, suing appellant for divorce. Appellant hired defendant Andrew Viola, Esquire to represent her in the divorce case. Appellant entered into a written fee agreement with Viola for an hourly rate of $150, with a $1,500 retainer. The husband was represented by his own counsel.

In 2002, the husband was a truck driver making approximately $85,000 per year.[3] Appellant worked as a florist, making $13,000 per year.

Appellant and the husband are the parents of two children of the marriage: a daughter born in September 1988, and a son born in May 1992. Both children are diagnosed with autism, and the daughter is also diagnosed with Asperger Syndrome. According to appellant, although the son is now over twenty-one years old, he "functions on an average level of [an] eight or nine-year-old [child] with language skills of a three year old [child and] needs 24 hours care[.]" Both children currently reside with appellant, and they did so at the time of the couple's divorce in 2003. The son was additionally diagnosed with epilepsy in 2009.

Through their divorce counsel, the couple submitted initial settlement proposals in anticipation of the Matrimonial Early Settlement Panel ("MESP") scheduled for January 28, 2003. The parties disagreed in their MESP submissions regarding several substantive issues. However, ultimately, the only issues the parties could not agree on were the amount of an alimony award and child support to be paid by the husband to appellant.

---

[3] The husband asserted in his Marital Early Settlement Panel memo that due to his employer losing a contract he had been working less hours since December 2002, and his weekly wages had declined by approximately $300 per week.

The husband did not offer any alimony in his MESP proposal. Meanwhile, Viola advocated in his MESP memo that appellant "must care for two (2) autistic children," that "[the husband] was the main means of support between the parties during the course of this seventeen (17) year marriage," that "[appellant] is [forty-one] years old and has no special skills or training," and therefore, "this seems to be a permanent alimony case." Viola took the position that the husband should pay permanent alimony in the amount of $400 per week.

The MESP panel recommended appellant be awarded her requested sum of $400 per week in permanent alimony and $226 per week in child support. The matter did not settle during the MESP.

About two weeks after the MESP session, on February 10, 2003, the husband, through his counsel, offered appellant $300 per week in LDA for a term of seven years, and $140 per week in child support ($70 per child). Appellant rejected that offer.

Thereafter, the couple reached an apparent agreement that the husband would pay appellant $315 per week in alimony and $200 per week in child support, for a period of four years. However, Viola wrote a letter to the Family Part judge, notifying the court that appellant had decided she "will be unable to maintain a comparable standard of living at that support level," and that "[she]

8                                                              A-1810-18T4

cannot maintain herself and her (2) autistic children unless the total support exceeds $600.00 as recommended by the MESP Panel."

Ultimately, the couple reached a final agreement that was memorialized in a Dual Final Judgment of Divorce on May 28, 2003. Section 2.2 of the divorce judgment required the husband to pay appellant $200 per week ($100 per child) in child support. This figure was calculated based on a stipulation that the husband's annual income was then approximately $80,000, and appellant's annual income was approximately $18,000.

Section 3.1 of the divorce judgment, which is language that appellant now alleges was not correctly explained to her by Viola at the time of the agreement, provides:

> 3.1 SPOUSAL SUPPORT. The parties stipulate that Husband has a current annual income of $80,000.00 and Wife has a current annual income in the amount of $18,000.00. For the mutual promises and covenants contained herein, <u>Husband hereby stipulates and agrees to pay Wife an amount of $325.00 weekly as alimony for her support and maintenance. This amount will be paid on a bi-weekly basis, due Friday, for a term of nine (9) years from the date of this Order</u>. Further the parties stipulate that said alimony will terminate upon the marriage or cohabitation of Wife. If two payments are more than ten (10) days late, Wife may seek an ex-parte order, upon certification, to have all payments through the appropriate probation department via wage execution. <u>Wife may make Lepis or Cruz [sic] [Crews]</u>

> application after the expiration of the said (9) year term
> to continue support.[4]
>
> [(emphasis added).]

The couple also agreed that husband would fund a special needs trust for the children, backed by a $250,000 life insurance policy.

Before entering the final judgment, the Family Part judge conducted an uncontested divorce proceeding, at which the terms of the Settlement Agreement were discussed. The parties supplied only one page of a transcript created from that hearing, and it does not contain appellant's testimony.[5]

B. The Husband's Post-Judgment Attempts to Reduce Alimony

In February 2005, the husband moved to reduce his alimony payment obligations. His supporting certification claimed that his income had "shrunk 15% from $80,000 to $68,000," and that he had experienced multiple layoffs, which constituted a "substantial change in circumstances." In her opposition to husband's motion, appellant asserted that "[t]he current support amount was

---

[4] See Lepis, 83 N.J. at 139, and Crews v. Crews, 164 N.J. 11, 28 (2000) (further elaborating upon Lepis and instructing that a party seeking modification of an alimony award must demonstrate that changed circumstances have substantially impaired his or her ability to support himself or herself).

[5] Unfortunately, the full transcript no longer exists, and the audio recording of the proceeding has not been preserved.

arrived at after substantial debate and an analysis of [the husband's] ability to earn based on past history."  The court denied the husband's request for a downward modification.

The husband filed another motion seeking a reduction of the alimony award in September 2008, again claiming a reduction of his income. Appellant retained Viola as her counsel to oppose the application.  The Family Part denied the husband's request for a reduction, and ordered the husband "shall continue to pay alimony to [appellant] in the amount of $325 per week until May 2012."

C.  Appellant's Post-Judgment Attempts to Increase and Extend Alimony

In 2012, appellant retained a successor attorney to represent her on a motion to extend her alimony award upon its scheduled nine-year expiration, and also increase it.  Her new counsel wrote a letter to the husband in March 2012, notifying him that he had been retained by appellant to seek to extend the length of her alimony.  The successor attorney referenced the parties' 2003 agreement, stating that it "specifically provides that your former wife has the right to make a Lepis or Crews application after the expiration of your initial nine-year term to continue support."

In her May 2012 supporting certification, appellant contended her marital budget at the time of the divorce in 2003 was approximately $5,700 per month, however she and husband were already separated for two years at that point. She certified that her then-current budget in 2012 was $5,000 per month, "obviously a significant reduction in [her] lifestyle." She earned $9,100 in 2011 working in elder care. She certified her gross monthly income was $3,393, which included income from her employment, child support, and alimony. The parties' son also received $364.32 per month in Social Security benefits. Appellant contended that a termination of alimony, as scheduled, would result in a "drastic decrease in [her] income from $3,393 per month (alimony, child support and income) to $1,995.20."

Based on these figures, the length of the marriage, the "extensive additional responsibilities [she has] for [their] two special needs children," her "very limited income," "[her] age," and "the fact that currently, [she] must struggle even with alimony to meet one-half of the standard of living enjoyed during the marriage," appellant requested the Family Part to convert the limited duration of the ex-husband's alimony payments to an award of permanent alimony. Appellant further requested the court to require her ex-husband to

"continue to pay [her] permanent alimony in the amount of at least $500.00 per week."

The husband opposed appellant's motion for relief. He asserted that the couple's marital budget was never $5,700. Instead, he certified they had lived on a budget of between $3,000 and $4,000 per month "as [appellant] testified [at the 2003 uncontested divorce proceeding] in court." He further argued that the parties' divorce agreement did not alleviate appellant's burden to demonstrate "changed circumstances" to increase alimony, and "unusual circumstances" to extend the duration of payments.

The husband asserted that, while his own income had decreased dramatically since the divorce, appellant's "needs remain basically the same today as they were when [they] divorced in 2003." He also emphasized "her family unit has the benefit of [the daughter's] earnings to offset some of her expenses and the monthly stipend paid to [appellant] by Social Security for [the son]."

After hearing oral argument, the Family Part judge denied appellant's motion to extend the LDA beyond the nine-year term specified in the divorce judgment. In his June 29, 2012 oral opinion, the Family Part judge found that appellant had neither demonstrated unusual circumstances under N.J.S.A.

2A:34-23(c), or a change in circumstances under <u>Lepis</u> and <u>Crews</u> to justify the requested temporal extension or increase. Among other things, the judge noted that the daughter, who was age fifteen at the time of the divorce, was by that point the age of twenty-three and was earning $200 per week outside the home. The judge further noted that appellant was receiving Social Security benefits and other resources that were, in combination, more than what she had been receiving in 2003.

### D. Appellant's Motion for Reconsideration in the Family Part

Appellant retained a different successor attorney to represent her on a motion to reconsider the Family Part's denial of her request to extend the LDA term. That second successor obtained the assistance of Viola, who drafted and signed a certification in support of his former client's reconsideration motion.

Among other things, Viola recounted in his certification the efforts he had made on behalf of appellant in 2003 when he negotiated the LDA provision with the husband's attorney. As Viola noted, the issue of the duration of alimony was "the subject of substantial and at times contentious negotiations." As Viola recalled the context:

> 3.     Plaintiff [the husband] argued that this was not a permanent alimony case, that Defendant [appellant] should be entitled to a period of rehabilitative alimony whereupon she should be able to

support herself in a manner enjoyed during the marriage.

    4.    Defendant argued that she barely worked during the marriage, had a lack of marketable skills that would benefit her in the workplace and was charged with the care of two (2) autistic children that would interfere with her ability in the future to obtain employment or the training to obtain significant employment.

Viola's certification then explained his understanding of the nine-year

LDA provision that was ultimately achieved:

    5.    With trial fast approaching, a compromise was struck. Plaintiff agreed to pay term alimony for a period of nine (9) years however <u>Defendant would retain the right to make an application to continue alimony if the end of the term found her unable to support herself in the manner enjoyed during the marriage</u>. This answered Plaintiff's concerns respecting permanent alimony but <u>protected Defendant in the event that her financial need continued</u>.

    6.    It was <u>the clear understanding of the parties</u> that if Defendant <u>never obtained the employment or training to allow her to support herself in the manner enjoyed during the marriage that support would continue</u>.

    7.    The Final Judgment of Divorce was drafted by Plaintiff's counsel. Perhaps in retrospect it might have been drafted more clearly. However, the agreement plainly states that "Wife may make <u>Lepis</u> or <u>Cruz</u> [sic <u>Crews</u>] application after the expiration of the said nine (9) year term to continue support.

8. The Crews case at the time required the Court to look at whether the supported spouse could maintain a lifestyle that is reasonably comparable to the standard of living enjoyed during the marriage.

9. It was my clear recollection that all parties agreed that if Defendant could meet this standard of living, alimony would terminate. If Defendant could not meet this standard of living, alimony would continue.

10. The clause to allow Defendant to file an application after nine (9) years to continue support was specifically inserted to protect Defendant in the event her financial circumstances never improved during the term.

[(Emphasis added).]

In stark contrast, the ex-husband's attorney certified there "was no unarticulated understanding that [alimony] would continue if defendant did not get a job or did not train herself to get one. Further, he maintained "there was no agreement that if the defendant could not maintain a lifestyle reasonably comparable to the standard of living enjoyed during the marriage that alimony would continue." The ex-husband's counsel further asserted that the language in Section 3.1 of the divorce judgment was superfluous, because it gave appellant no rights that she did not already have and did not exempt her from the applicable requirements of the alimony statute, N.J.S.A. 2A:34-23(c).

The Family Part judge denied appellant's reconsideration motion in an oral decision on August 31, 2012. The judge again concluded that appellant had not made a prima facie showing of either changed circumstances under Lepis and Crews, or unusual circumstances under N.J.S.A. 2A:34-23(c).

E. Appellant's 2013 Appeal from the Family Part

With the assistance of her second successor counsel, appellant appealed the Family Part's denial of her request to extend the LDA term beyond the agreed-upon nine years. On June 17, 2013, a panel of this court issued an unpublished opinion affirming the Family Part's decision, substantially for the reasons expressed by the trial court. Jones v. Jones, No. A-0238-12 (App. Div. June 17, 2013) (slip op. at 1).

In reaching our decision, we emphasized that "voluntary and consensual" agreements are "entitled to considerable weight with respect to their validity and enforceability, especially when incorporated into a judgment of divorce." Id. at 6. We noted that "[b]ased on the length of the parties' marriage, defendant was potentially entitled to permanent alimony." Ibid. However, "for any number of reasons, represented by counsel, defendant chose to negotiate a [divorce agreement] that included a nine-year limited duration alimony provision, guaranteeing her [total] payment of $152,100, and allowing her the opportunity

to make a <u>Lepis</u> or <u>Crews</u> application after that date." <u>Ibid.</u> Our opinion specifically agreed with the trial court that appellant "failed to establish unusual circumstances under the statute or a substantial change in circumstances on the issue of the ability to support herself to justify extending her alimony under the <u>Lepis</u> standard." <u>Id.</u> at 5.

F. The Current Malpractice Lawsuit

Appellant thereafter filed the current legal malpractice action. Her amended complaint asserts she "relied specifically upon Viola's representation that she would be entitled to continue the alimony if she needed it." She claims Viola was negligent, that he breached contractual and fiduciary duties owed to her, and that he deviated from accepted standards of care.

In support of her contentions, appellant obtained expert reports from two experienced matrimonial attorneys. Their reports opine that Viola deviated from the applicable standards of care by failing to negotiate permanent alimony for appellant and, also, by giving her erroneous legal advice that she would be able to obtain an extension of the nine-year LDA period from the Family Part as long as her financial need for that support continued.

The defense, meanwhile, retained its own legal expert, who opined that the operative factors did not necessarily require the Family Part to award

permanent alimony if the case had gone to trial. The defense expert contended that Viola obtained a potential benefit for appellant by negotiating a Lepis/Crews "changed circumstances" standard in the agreement, relaxing the statute's requirement of "unusual circumstances."

The defense expert further disputed appellant's claims of proximately-caused damage, contending it is speculative that the Family Part would have awarded more generous alimony terms if the case had gone to trial. The defense also contended (although without filing a third-party complaint) that appellant's successor counsel should have been more effective in presenting appellant's motion to extend her alimony award.

During her deposition in this malpractice case, appellant recalled that Viola had discussed with her the legal significance of the nine-year LDA period. According to appellant's testimony, Viola "never mentioned a motion or application" to the court would be needed to extend alimony. As she put it, Viola "just said if I needed it [the alimony] at the end of nine years, it would continue."

In his own deposition, Viola recalled having "extended conversations" with appellant about the standards for LDA modification and time extension. As Viola described it, he told appellant that "she could come to court and make

A-1810-18T4

an application to [sic] – for either a change of circumstances or to continue support at the end of the term."  [(emphasis added).]  Viola denied representing to appellant that "she would be protected."

G.  The Summary Judgment Motion

Defendants moved for summary judgment on several grounds.  Following briefing and oral argument, the Law Division judge granted defendants' motion, for several reasons set forth in an oral opinion issued on November 30, 2018.

First, the motion judge ruled that appellant's malpractice case was time-barred, based on a premise that her cause of action accrued in 2003 when the divorce agreement was entered.  Second, the judge ruled that appellant was equitably estopped from contending her attorney's alleged malpractice had caused her injury, because she had given her knowing and voluntary assent to the divorce agreement.  Third, the judge found that, even if appellant's claims were not procedurally or equitably barred, she could not prove proximate causation of damages, because her contention that a Family Part judge would have awarded her permanent alimony at a trial was fatally "speculative."

III.

In legal malpractice cases, as in other cases, summary judgment is appropriate only where there is no genuine dispute of material fact. Sommers v.

McKinney, 287 N.J. Super. 1, 9 (App. Div. 1996) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). "[W]hen reviewing summary judgment motions, we must view the 'evidential materials . . . in the light most favorable to the non-moving party.'" Puder v. Buechel, 183 N.J. 428, 440 (2005) (quoting Brill, 142 N.J. at 540). We apply these well-settled principles to this appeal.

The governing law of legal malpractice is likewise well-established. Legal malpractice suits are grounded in the tort of negligence. McGrogan v. Till, 167 N.J. 414, 425 (2001). The elements of a cause of action for legal malpractice are: "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." Ibid. (citing Conklin v. Hannoch Weisman, 145 N.J. 395, 416 (1996)). A lawyer is obligated "to exercise that degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise." St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 588 (1982).

A.

Before considering the substance of appellant's legal malpractice claims, we first must consider the threshold questions of whether her lawsuit is time-

barred or equitably estopped. We disagree with the motion judge's determination that such procedural bars to her lawsuit apply here.

1.

It is undisputed that the applicable statute of limitations for legal malpractice cases in this State is the generous six-year period set forth in N.J.S.A. 2A:14-1. That statute requires a legal malpractice action to commence within six years from the accrual of the cause of action. Vastano v. Algeier, 178 N.J. 230, 236 (2003). A cause of action "accrues when an attorney's breach of professional duty proximately causes a plaintiff's damages." Ibid. (quoting Grunwald v. Bronkesh, 131 N.J. 483, 492 (1993)).

The Supreme Court has recognized the unfairness of an inflexible application of the statute of limitations in legal malpractice cases, in situations where a client would not reasonably be aware of "the underlying factual basis for a cause of action" to timely file a complaint. Ibid. (quoting Grunwald, 131 N.J. at 492). As the Court has instructed, in some circumstances "a client may not be able to detect the essential facts of a malpractice claim with ease or speed because of the complexity of the issues or proceedings, or because of the special nature of the attorney-client relationship." Ibid. Therefore, the statute of limitations does not accrue until "the client suffers actual damage and discovers,

22

or through the use of reasonable diligence should discover, the facts essential to the malpractice claim." Ibid. (citing Grunwald, 131 N.J. at 494).

Based on our objective review of the record, appellant's cause of action for legal malpractice did not accrue until 2012 when the Family Part denied her motion to extend the LDA alimony period beyond the nine years specified in the divorce judgment. Appellant did not sustain "actual damage" until those motion proceedings in the Family Part made clear that she would not be able to have the alimony extended simply because she "continued" to need that financial support. Instead, at the very least, a change in circumstances (or, as the statute prescribes, "unusual" circumstances) had to be proven.

Viola's 2012 certification was predicated on this mistaken premise, as he construed the divorce judgment to mean that if appellant could not maintain her standard of living without her ex-husband's support, "alimony would continue." It was not until the Family Part interpreted and adjudicated the agreement in 2012 that this mistaken assumption was flatly repudiated.

Appellant's cause of action did not accrue until her expectation of continued alimony was dashed. This legal malpractice case was initially filed in 2016, well within six years of the Family Part's adverse 2012 ruling, which was later upheld on appeal in 2013.

We appreciate the difficulties of an attorney being forced to defend advice he gave to a client more than a decade earlier. But that difficulty is largely a function of the generous six-year limitations statute and the Supreme Court's equity-based accrual doctrine (which, parenthetically, also at times requires physicians and other professionals to defend actions that they took many years earlier before the harm to the plaintiff ultimately manifested). We accordingly reverse the court's statute of limitations ruling.

2.

Defendant's equitable estoppel arguments pose more difficult issues, but also, on close inspection, should not preclude appellant's malpractice case. These estoppel principles have been principally delineated in a series of three opinions of the Supreme Court.

First, in Ziegelheim v. Apollo, 128 N.J. 250 (1992), the Court held that a legal malpractice case could proceed against the client's former attorney who had allegedly been negligent in representing her in her divorce action, despite the fact that she had voluntarily agreed to the terms of the divorce settlement and had acknowledged that it was "fair." Id. at 257. The Court ruled that the client was not equitably estopped from contending in her malpractice case that her former attorney had negligently convinced her to accept an agreement that a

reasonably prudent divorce attorney would have recommended her to reject. Id. at 260. Although the Court cautioned against excessive malpractice lawsuits by disgruntled former clients, it explained that "[t]he fact that a party received a settlement that was 'fair and equitable' does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." Id. at 265.

The Court limited these principles from Ziegelheim to some extent in its later opinion in Puder, 183 N.J. at 430. In that case, a wife orally accepted a settlement in a divorce action and was in the process of memorializing the agreement. After consulting with a second attorney, she then reneged on the agreement. Id. at 432. The husband filed a motion to enforce the first agreement, and the wife filed a malpractice claim against her first attorney. While the malpractice case was pending, and before the court ruled on the enforceability of the first agreement, the parties reached a second settlement agreement. Id. at 430. The Supreme Court held that the trial court appropriately dismissed the malpractice lawsuit, because the wife had made sworn representations to the Family Part that the second settlement was "acceptable" and "fair." Ibid.

The Court distinguished Puder from Ziegelheim mainly because the wife in Puder had made a "calculated decision" to accept the second settlement despite being aware of the discovery inadequacies that had preceded the first settlement.  Id. at 442-43.  The wife assented to the second settlement "well aware that the [first] attorney was negligent." Id. at 443.  The Court also noted the substantial time that had passed since the attorney had represented the client. Id. at 445.  Consequently, the wife was equitably estopped from pursuing the malpractice case in such circumstances.  Id. at 444-45.

Most recently, the Court in Guido v. Duane Morris, 202 N.J. 79 (2010), further illuminated these principles, in the setting of a legal malpractice case arising out of business litigation.  In Guido, a corporate officer sued his former law firm for malpractice, alleging the firm had not adequately disclosed to him the stock disadvantages that would accompany a settlement. Id. at 83. The plaintiff attested in court that he understood the terms of the settlement and did not have any concerns. Id. at 84.  He then brought a malpractice action against his former law firm for failing to warn him about the voting implications of the settlement agreement with his former employer. Id. at 85-86.  The trial court ultimately ruled the malpractice case could proceed, despite the settlement of the business case.

A-1810-18T4

The Supreme Court upheld that result, agreeing with the trial court that the client in Guido was not equitably estopped from bringing the malpractice case. Among other things, the Court noted the client had never attested that the settlement of his business case was fair and adequate. Id. at 95.

Applying these principles from Ziegelheim, Puder, and Guido here, we conclude that appellant is not equitably estopped from pursuing this legal malpractice case in the distinctive circumstances presented. We are mindful that Section 6.9 of the divorce judgment contains a recital that both spouses deemed the terms of their agreement to be "fair and reasonable," as follows:

> 6.9 Voluntary Execution. The parties each acknowledge and represent that this Agreement is fair and reasonable under the circumstances and has been spread upon the record in open court on May 15, 2003 and agreed to by each of them, of their own free will, free from persuasion, fraud, undue influence or economic, physical or emotional duress of any kind whatsoever exerted by the other or by other persons.
>
> [(emphasis added).]

We appreciate the representation of appellant's counsel at oral argument before us that, although no full transcript of the 2003 uncontested divorce proceeding now exists, it would have been customary for both spouses to have acknowledged in open court under oath that they believed the settlement terms were fair and reasonable.

27                                                          A-1810-18T4

Even so, we perceive the present circumstances to be distinguishable from the setting in <u>Puder</u>. Here, the client was not aware at the time of the divorce settlement that her attorney had been negligent. As we have already noted, it was not apparent until the motion practice in 2012 before the Family Part that the divorce agreement would not—as appellant and Viola had incorrectly presumed—allow appellant to keep receiving alimony based simply upon a showing of continued need.

The recital in Section 6.9 is therefore based upon a faulty premise, at least from the perspective of appellant. Under the circumstances, appellant reasonably could have thought the settlement was "fair" and "reasonable" only because her lawyer supposedly had advised her that alimony would be extendable beyond the nine-year LDA term upon mere proof of continued need and an inability to maintain her lifestyle. Again, we are mindful of the intervening passage of time, but that long delay is not entirely appellant's fault. She reasonably took action when the nine-year LDA deadline was looming and endeavored at that time to obtain judicial relief. She did not "lie in the weeds."

We accordingly reverse the motion judge's estoppel ruling.

## IV.

We lastly turn to the merits of the malpractice case.  As we must, we view the summary judgment record in a light most favorable to appellant.  W.J.A. v. D.A., 210 N.J. 229, 238 (2012).  Having done so, we objectively perceive there are numerous genuine issues of liability and damages that are appropriate for a jury to evaluate.

Appellant has presented a more than plausible case—supported by her two experts—that she received inadequate advice and representation in her divorce action.  Viola's certification substantiates that he himself erroneously believed that alimony could be extended so long as appellant could show a continued need for the support.  That standard is not the law, nor is it the standard expressed in the divorce judgment.  Instead, at a minimum, "changed" circumstances were required for the alimony provision to be altered.

To some extent, Viola did negotiate a benefit for appellant by obtaining the husband's agreement to a standard of "changed" circumstances under Lepis and Crews, rather than the harsher "unusual" circumstances imposed by N.J.S.A. 2A:34-23(c).  Yet that standard is still more rigorous than the standard of "continued need" that, according to appellant, Viola had represented to her

would control. Given the alleged incorrect advice, there is a viable issue of deviation from the requisite standard of care presented for a jury.

Additionally, we are satisfied that there are genuine and triable issues of proximate causation. We acknowledge it can never be certain what a Family Part judge actually would have done if the case had proceeded to trial, and whether permanent alimony (or, alternatively, a longer period of LDA exceeding nine years) would have been awarded. The need to imagine, in retrospect, what might have or was likely to have occurred is inherent in the context of any legal malpractice case arising out of settled litigation. See, e.g., Lieberman v. Employers Ins. of Wausau, 84 N.J. 325 (1980). As Lieberman authorizes as an option, the trial court on remand shall consider allowing the parties "to proceed through the use of expert testimony as to what as a matter of reasonable probability would have transpired at the original trial." Id. at 344 (emphasis added).

At trial, appellant will have the burden of proving by a preponderance of the competent, credible evidence, "what injuries were suffered as a proximate consequence of the attorney's breach of duty." Cortez v. Gindhart, 435 N.J. Super. 589, 604 (App. Div. 2014) (quoting 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 488 (App. Div. 1994)). As part of the jury's analysis,

it may consider whether appellant's successor counsel contributed to the alleged harm by not advocating her interests more persuasively in the 2012 motion practice and, in particular, by not stressing the son's post-divorce diagnosis of epilepsy in 2009 that could have further impeded appellant's ability to work.

## V.

For all of these reasons, summary judgment is vacated. In doing so, we express no views as to an appropriate outcome of the case.

Reversed and remanded for trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1810-18T4